138

[No. 20405-7-III. Division Three. April 29, 2004.]

THE STATE OF WASHINGTON, *Respondent*, v. MONTE HOISINGTON,
*Appellant.*

*Neil P. Cox*, for appellant.

*Christine O. Gregoire, Attorney General,* and *Sarah B. Sappington, Senior Counsel,* for respondent.

BROWN, J. — On Monte Hoisington's scheduled release date from imprisonment for second degree rape, the State petitioned to commit him as a sexually violent predator (SVP). A jury found Mr. Hoisington to be an SVP, and the trial court committed him to the Special Commitment Center (SCC). Mr. Hoisington appeals contending (1) recent Supreme Court precedent mandates remand for consideration of less restrictive alternatives (LRAs), (2) RCW 71-.09.030 is unconstitutional because it allows the State to file an SVP petition shortly before his release, (3) the State violated his right to substantive due process by delaying the filing of the petition, (4) the State violated his right to substantive due process by denying him treatment during his imprisonment, (5) lack of sufficient evidence showing he was a risk to reoffend, and (6) the trial court erred in admitting a psychologist's expert opinion. We affirm.

## FACTS

On August 23, 2000, Mr. Hoisington appeared before the Asotin County Superior Court for purposes of resentencing on his 1991 second degree rape and second degree burglary convictions pursuant to this court's opinion remanding the matter. *In re Pers. Restraint of Hoisington*, 99 Wn. App. 423, 993 P.2d 296 (2000). Concurrently, the State filed a petition alleging Mr. Hoisington was an SVP who should be commit-

ted under chapter 71.09 RCW. In its certification for determination of probable cause, the State recounted the facts underlying Mr. Hoisington's convictions for three sexually violent offenses committed in 1977, 1978, and 1991.

Regarding the 1991 conviction, the State noted this court had remanded in 2000 for resentencing to a term of 120 months. The State alleged Mr. Hoisington admitted raping a woman with a disability (multiple sclerosis) in 1991, an uncharged offense. The State alleged several nonsexual criminal acts, such as prowling. The State alleged Mr. Hoisington signed an agreement to participate in the Sex Offender Treatment Program (SOTP) in 1992, but because of his remanded sentence, it was not possible to complete the program before the scheduled date of Mr. Hoisington's release, August 23, 2000. Finally, the State alleged psychological evaluations showed Mr. Hoisington was more likely than not to "commit a predatory offense of sexual violence, if not confined to a secure facility." Clerk's Paper's (CP) at 14.

The superior court ordered Mr. Hoisington held without bail for a 72-hour probable cause hearing scheduled for August 25, 2000. Mr. Hoisington waived his right to a 72-hour hearing and agreed to a rescheduled hearing. On August 31, 2000, the superior court found probable cause existed to believe Mr. Hoisington was an SVP and ordered him transported to the SCC for purposes of an SVP evaluation.

On May 23, 2001, the State filed the SVP commitment evaluation completed by psychologist Carla van Dam, Ph.D. Dr. van Dam concluded, "to a reasonable degree of psychological certainty, Mr. Hoisington does appear to meet the statutory criteria to be considered a sexually violent predator in accordance with RCW 71.09." CP at 261.

Mr. Hoisington moved unsuccessfully to dismiss the petition and/or exclude the opinion testimony of psychologist Dennis M. Doren, Ph.D., who issued a June 2001 report determining Mr. Hoisington to be more likely than not "to

engage in predatory acts of sexual violence . . . if not con-
fined in a secure facility." CP at 354.

At the commitment trial, T.B. testified Mr. Hoisington
raped her in 1977 in Lewiston, Idaho and was convicted. He
held a knife to her throat. The trial court entered into
evidence the charging documents and judgment of convic-
tion connected with the rape.

E.H. testified via videotaped deposition that a man as-
saulted her in her Boise, Idaho apartment in April 1991.
She could feel a knife against her throat. She asked the
intruder if he was going to rape her, and he said, " 'Yes.' "
Ex. 14 at 7. E.H. asked to use the bathroom, and the
assailant helped her walk there because of her multiple
sclerosis. After E.H. left the bathroom, the man assaulted
her on the bed and then apparently helped her into the
shower. The intruder was gone by the time she finished her
shower. She did not see her assailant's face, but she picked
out his voice from police recordings. E.H. could not specifi-
cally remember being raped, but after she underwent a
hospital examination she knew she had been sexually
assaulted. She was not aware of any subsequent prosecu-
tion of the crime.

Boise Police Detective Mark Ayotte testified he investi-
gated the rape of E.H. and requested physical evidence
from her sexual assault examination. He received a request
from Asotin County to execute an arrest warrant on Mr.
Hoisington. From that contact, Detective Ayotte noted simi-
larities between the Asotin County matter and the rape of
E.H.

The detective then arrested Mr. Hoisington and interviewed
him about the Boise rape, which Mr. Hoisington denied. After
the detective obtained DNA (deoxyribonucleic acid) testing
results that did not eliminate Mr. Hoisington as a suspect in
the Boise rape, he conducted a second interview at the Walla
Walla penitentiary. At the second interview, Mr. Hoisington
admitted raping E.H. and related details as to the rape and
the victim's disability. The detective also testified that Mr.
Hoisington admitted raping another woman in Ada County,

Idaho. Additionally, the detective stated that E.H. identified Mr. Hoisington's recorded voice. The detective also testified that as far as he knew neither of the Idaho rapes was prosecuted.

A.H. testified she was confronted by a male intruder in her mother's bedroom on a June 1991 evening. The intruder let A.H. go to the bathroom but watched over her as she used the toilet, telling her to hold her head down so she could not see him. The assailant then took her to the kitchen, put tape over her eyes, and held a knife to her throat as he moved her back to the bedroom. The man then raped her repeatedly, vaginally, anally, and orally. Afterward, the rapist told A.H. to take a shower and made his escape while she did so. A.H. later identified Mr. Hoisington from a photo lineup. The trial court admitted into evidence the second amended information and the second amended judgment and sentence regarding Mr. Hoisington's conviction for raping A.H.

The trial court allowed into evidence the information, judgment of conviction, and amended judgment relating to Mr. Hoisington's rape of a woman in Nez Perce County, Idaho in 1977.

Dr. Doren testified that in his professional opinion Mr. Hoisington suffered from a mental abnormality, paraphilia. The doctor opined that a person suffering from Mr. Hoisington's type of paraphilia is predisposed to committing criminal sexual acts against other people. Based on his training, experience, and Mr. Hoisington's records, Dr. Doren gave the following opinion:

> My opinion to a reasonable degree of professional certainty or psychological certainty is that Mr. Hoisington does represent a risk that is, ah, at least more likely than not, ah, my understanding of terms likely, ah, at least more likely than not to engage in predatory acts of sexual violence defined by the statute.

Report of Proceedings (RP) (Vol. R) at 513-14.

Dr. Doren further testified that three actuarial assessments factored into his evaluation of Mr. Hoisington. Ac-

cording to the doctor, Mr. Hoisington "fell into the lower end of high or moderate high range of risk." RP (Vol. R) at 524. But Dr. Doren added that psychologists did not rely on such tools alone because they do not include other factors needed for evaluation. In conclusion, it was Dr. Doren's opinion that Mr. Hoisington was likely to engage in predatory violent sex crimes if not confined in a secure facility.

During Dr. Doren's cross-examination, Mr. Hoisington unsuccessfully attempted to enter into evidence a proposed contract wherein Mr. Hoisington promised to abide by certain conditions in return for the Department of Social and Health Service's (DSHS) promise to drop the SVP petition without prejudice. The trial court reasoned the proposed contract was irrelevant and assumed facts not in evidence.

At the close of the State's case in chief, the trial court denied Mr. Hoisington's motion to dismiss for lack of evidence of his alleged risk of future offenses.

Mr. Hoisington relied mainly on the testimony of Brian Judd, Ph.D., a psychologist who testified he was unable to make a diagnosis of antisocial personality disorder. On cross-examination, Dr. Judd testified he did not find Mr. Hoisington's accounts of the rapes credible, and he believed Mr. Hoisington was not forthcoming.

On July 25, 2001, the jury found Mr. Hoisington to be an SVP. Consequently, the trial court ordered Mr. Hoisington's commitment to the SCC.

On August 1, 2001, Mr. Hoisington appealed the order of commitment. This court stayed the matter until the Supreme Court issued its mandate for *In re Detention of Thorell*, 149 Wn.2d 724, 72 P.3d 708 (2003).

## ANALYSIS

### A. Less Restrictive Alternative Evidence

The issue is whether the trial court erred in not allowing Mr. Hoisington to present evidence of LRAs, specifically the

contract wherein he promised to undergo sex offender treatment while on conditional release.

■ We review the trial court's evidentiary decisions for abuse of discretion. *State v. Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997). "An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court." *Id.* (citing *State v. Huelett*, 92 Wn.2d 967, 969, 603 P.2d 1258 (1979)).

■ At the time of Mr. Hoisington's SVP trial, the LRA issue was unsettled. The Supreme Court has since resolved the issue in the State's favor; LRAs cannot be considered until the first annual review after commitment. *Thorell*, 149 Wn.2d at 752-53. On this point, the Supreme Court overruled its holding in *In re Detention of Brooks*, 145 Wn.2d 275, 292, 36 P.3d 1034 (2001), and reversed the Division One opinion of *In re Detention of Ross*, 102 Wn. App. 108, 6 P.3d 625 (2000), *reversed sub nom. In re Detention of Thorell*, 149 Wn.2d 724, 72 P.3d 708 (2003). Mr. Hoisington relies entirely on *Brooks* and *Ross*; therefore, his argument that the trial court should have considered LRAs at his commitment trial necessarily fails.

## B. Due Process

The issue is whether RCW 71.09.030 violates due process because it provides for filing of the SVP petition when the defendant is "about" to be released from prison.

■ ■ A statute is presumed constitutional and the challenging party bears the heaviest burden of proving the statute's unconstitutionality beyond a reasonable doubt. *State v. Ward*, 123 Wn.2d 488, 496, 869 P.2d 1062 (1994). Mr. Hoisington falls well short of this standard. He cites no legal authorities to support his novel constitutional theory. Mr. Hoisington merely speculates things might have turned out better for him had the State filed the petition much earlier during his incarceration. We will not consider fleeting and unsupported assertions of constitutional claims. *See, e.g., State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d

1082 (1992). Accordingly, Mr. Hoisington's argument is unpersuasive.

## C. Constitutionality of RCW 71.09.030

The issue is whether RCW 71.09.030 violates due process and is unconstitutional because it permitted the State to delay filing the SVC petition until just before Mr. Hoisington's scheduled release.

 Again, Mr. Hoisington fails to brief this complex constitutional issue sufficiently to allow meaningful review. *See Johnson*, 119 Wn.2d at 171. In any event, "[s]ubstantive due process is violated only by 'arbitrary conduct shocking to the conscience.'" *Estate of Lee v. City of Spokane*, 101 Wn. App. 158, 170, 2 P.3d 979 (2000) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 836, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)). In this connection, the SVP statute does not require earlier filing of the petition. RCW 71.09.030. Here, the State did exactly what the statute authorized, and Mr. Hoisington has not cited any verifiable facts showing he was prejudiced by the filing of the petition as he was "about" to be released. RCW 71.09.030(1). On this record we cannot say the State's actions were so arbitrary as to shock the conscience. Consequently, Mr. Hoisington has not shown a substantive due process violation.

## D. Delayed Treatment

The issue is whether due process is violated by the State's failure to treat Mr. Hoisington in prison before the State filed the SVP petition.

Here, the trial court originally imposed a term of life, which it later reduced to 30 years. Much later, the trial court reduced Mr. Hoisington's sentence to 10 years, which resulted in a release date of August 2000. Meanwhile, Mr. Hoisington was offered treatment in prison, but because of the remand, he would have been released before the treatment could even begin.

Apart from an inapplicable quote from a United States Supreme Court opinion, *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972), Mr. Hoisington's argument on this issue is utterly devoid of supporting legal authorities. He merely speculates treatment in prison might have allowed him to escape postprison commitment. As noted earlier, we will not consider fleeting constitutional arguments unsupported by legal authorities. *See Johnson*, 119 Wn.2d at 171.

■ In any event, the SVP statute does not require the defendant first undergo treatment in prison. *See generally* chapter 71.09 RCW. Treatment during prison is currently not a prerequisite to the filing of an SVP petition. RCW 71.09.030. The sole purpose of the commitment trial is to determine whether the person is an SVP. RCW 71.09.060(1). While treatment in prison is certainly relevant in making that determination, the SVP statute does not mandate such treatment. *See In re Det. of Ross*, 114 Wn. App. 113, 122-23, 56 P.3d 602 (2002), *review denied*, 149 Wn.2d 1015 (2003) (holding that State need not show the alleged SVP had declined to volunteer for treatment, but that evidence that person volunteered for treatment would be admissible evidence concerning SVP status).

Considering all, Mr. Hoisington's argument is not compelling.

### E. Evidence Sufficiency

The precise issue is whether the evidence was insufficient to show Mr. Hoisington was likely to reoffend.

■ We must determine whether the evidence, viewed in a light most favorable to the State, is sufficient to persuade a fair-minded, rational person that the State has proved beyond a reasonable doubt that Mr. Hoisington is a sexually violent predator. *Thorell*, 149 Wn.2d at 744. Among other things, a sexually violent predator is a person "likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(16).

Mr. Hoisington grounds his insufficient evidence arguments on a self-serving interpretation of Dr. Doren's testimony. Dr. Doren relied partly on certain actuarial instruments showing Mr. Hoisington's chances of "rearrest" or "reconviction." RP (Vol. R) at 521-23. These instruments generally indicated odds of "rearrest" or "reconviction" were less than 50 percent. Viewed in isolation and in a light most favorable to Mr. Hoisington, the actuarial data downplays his propensity to reoffend. But the correct standard of review requires us to view the evidence in a light most favorable to the State. *Thorell*, 149 Wn.2d at 744. When we review the actuarial data in context with the rest of Dr. Doren's testimony, as well as the testimony of Mr. Hoisington's own expert, Dr. Judd, the resulting inferences favor the State.

First, as noted, the actuarial instruments measure chances of "rearrest" and "reconviction," events that both Dr. Doren and Dr. Judd recognized as less likely to happen than "reoffense." RP (Vol. R) at 521-23; RP (Vol. U) at 761-62. Accordingly, calculating an accurate estimate of "reoffense" required an adjustment of the raw actuarial data. RP (Vol. S) at 550-52. Further, Dr. Doren made it abundantly clear that other factors, several of which related to Mr. Hoisington individually, supported his ultimate conclusion that Mr. Hoisington was more likely than not to reoffend.

Moreover, Dr. Judd doubted Mr. Hoisington's credibility because of the implausibility of his explanations of the rapes and his consistent refusal to submit to polygraph and plethysmograph testing. That cross-examination testimony seriously undermined Mr. Hoisington's defense.

Finally, the other evidence introduced at trial, particularly Mr. Hoisington's extensive history of violent and predatory rapes, charged and uncharged, would support a rational, fair-minded person's ultimate conclusion that he was likely to reoffend if not confined in a secure facility. Given all, the evidence was more than sufficient.

## F. Scientific Reliability

 The issue is whether Dr. Doren's methodology failed to meet the *Frye*[1] standard because it disregarded actuarial results tending to favor Mr. Hoisington. Again, the standard of review is abuse of discretion. *State v. Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997). "An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court." *Id.* (citing *State v. Huelett*, 92 Wn.2d 967, 969, 603 P.2d 1258 (1979)).

 Mr. Hoisington misapprehends Dr. Doren's methodology. Dr. Doren did not disregard the actuarial data. He included those findings within the mosaic of factors used to determine Mr. Hoisington's propensity to reoffend. Dr. Doren necessarily took into account structural shortcomings in the actuarial data, which estimated "rearrest" or "reconviction," not "reoffense," the relevant term for SVP purposes. RP (Vol. R) at 521-23. *See* RCW 71.09.060(1).

 Because a greater chance of "reoffense" than "rearrest" or "reconviction" exists, Dr. Doren recognized the raw data underestimated future dangerousness and thus considered a multitude of other factors, including Mr. Hoisington's extensive history of sexually violent acts. RP (Vol. S) at 550-52. Dr. Doren's approach, which is essentially a clinical approach incorporating actuarial data as one of its factors, is consistent with practices approved by the Supreme Court. *See Thorell*, 149 Wn.2d at 756 ("Based on our established precedent, we reiterate that the *Frye* standard has been satisfied by both clinical and actuarial determinations of future dangerousness."). Consequently, the trial court did not abuse its discretion in admitting Dr. Doren's testimony.

Affirmed.

SCHULTHEIS and KURTZ, JJ., concur.

Review denied at 153 Wn.2d 1031 (2005).

---

[1] *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923).