[No. 32413-0-II.   Division Two.   May 9, 2006.]

*In the Matter of the Detention of* GEORGE TAYLOR, *Appellant.*

*Peter B. Tiller* (of *The Tiller Law Firm*), for appellant.

*Robert M. McKenna, Attorney General*, and *Todd R. Bowers, Assistant*, for respondent.

¶1 ARMSTRONG, J. — George Taylor appeals an order committing him as a sexually violent predator to the Special Commitment Center at McNeil Island. He argues that the State violated his due process rights by filing the commitment petition two days before his scheduled release from confinement. Further, he argues that the court should have conducted a *Frye*[1] hearing on the issue of whether actuarial risk assessments are admissible and he asserts that his counsel was ineffective. We find no error and, accordingly, affirm.

---

[1] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013, 1014 (1923).

## FACTS

### I. Procedural Facts

¶2  On May 9, 2000, the State petitioned to civilly commit Taylor to a special commitment center (SCC) as a sexually violent predator (SVP) under chapter 71.09 RCW. The State's petition came two days before Taylor was scheduled to be released from prison after serving sentences on two counts of first degree rape and one count of first degree assault.

¶3  At the civil commitment trial, a jury found that the State had proved beyond a reasonable doubt that Taylor is an SVP. Accordingly, the court ordered Taylor committed to the custody of the Department of Social and Health Services in an SCC.

### II. Substantive Facts .

¶4  While he was incarcerated for the rape and stabbing of Melia Obado and Komic Skillern, Taylor admitted raping or attempting to rape 13 to 14 other women since he was 12 years old; he committed several of the rapes at knife point.

¶5  Taylor participated in every available sex offender treatment program during his incarceration. For example, from 1989 to 1990, he attended group counseling and classes in the introductory phase of sex offender treatment. From 1990 to 1998, he participated in other treatment programs, including Alternatives to Violence, Breaking Barriers (nonviolent conflict resolution), chemical dependency treatment, and victim awareness. He also received one-on-one counseling.

¶6  Then in 1998, he began intensive inpatient treatment at the Sex Offender Treatment Program (SOTP) at the Twin Rivers Corrections Center in Monroe. His therapist during this time was Maia Christopher. Christopher had worked at the SOTP as a treatment provider since 1994. She has extensive experience in treating sex offenders like Taylor.

¶7 Taylor received 17 months of treatment at SOTP from September 1998 through March 2000. In her deposition, Christopher explained that normally inmates are only in SOTP treatment from 12 to 14 months. Taylor spent more time in the program because of his "very active" offending pattern. Christopher Dep. at 21. His SOTP treatment included eight or more hours a week of group treatment plus individual sessions when necessary (sometimes once a week or more).

¶8 Christopher also said that the prison does not accept anyone into the SOTP program "unless they're a certain amount of time away from their early release date." Christopher Dep. at 25. She elaborated:

> If you come in with a sentence of five years or less, people are allowed to volunteer for treatment at that time and automatically go onto our waiting list. People are able to or given the information that they may volunteer for the treatment program any time after 18 months prior to the early release date.

Christopher Dep. at 24-25.

¶9 Christopher reported that Taylor's attendance at the treatment sessions was good but Taylor often changed the assignments he was given without permission. In addition, "[Taylor] had a lot of difficulty managing his masturbation and his fantasies," and he undermined the treatment staff's efforts to manage his arousal by, for example, watching television shows that had a high sexual content. Christopher Dep. at 18.

¶10 Even though Taylor finished 17 months of treatment, Christopher predicted that "[h]is risk level [for reoffense] is still high." Christopher Dep. at 21. He continued to have fantasies about raping women, masturbating several times a day. He also continued to sexually act out while in treatment; for example, he would touch the buttocks of female correctional officers and prison staff.

¶11 In fact, Taylor incurred several prison infractions for this impermissible touching. In January 1996, he received an infraction for touching the buttocks of a female guard at

the Department of Corrections. In November 1996, he received an infraction for "a compilation of accounts or accusations, stalking behavior and close proximity of female staff." Report of Proceedings (RP) at 660-61. In February 1997, he was disciplined for touching the buttocks of a female corrections officer. In August 1998, he touched a female member of the prison staff on the buttocks, and in November 1998, he touched a the buttocks of a female counselor in his chemical dependency program.

¶12 When the State petitioned for civil commitment, Taylor was transferred to the SCC. He immediately entered into sex offender treatment. Nevertheless, Taylor continued to incur violations for inappropriate conduct toward female staff members. In March 2001, he inappropriately touched a female staff member. He was sanctioned and segregated for this behavior, and the facility also imposed on him a rule to stay five feet away from all female staff members. In June 2001, he violated this five-foot rule. In September 2003, and again in November 2003, he was sanctioned for attempting to touch a female staff member. In November 2003, he ended his treatment at the SCC facility; however, he still receives one-on-one therapy.

### III. The Trial Testimony

¶13 Both the State and Taylor presented expert testimony at the civil commitment trial. Richard Packard, M.D., an expert for the State, evaluated Taylor to determine whether he meets certain criteria of the statutory definition of an SVP. Taylor hired expert Charles Jackson, M.D., to review Taylor's treatment records and to review the assessment instruments Packard administered.

¶14 Packard diagnosed Taylor as suffering from two mental abnormalities: paraphilia not otherwise specified (nonconsenting persons) and sexual sadism.

¶15 Packard testified that Taylor is more likely than not to commit predatory acts of sexual violence unless he is confined in a secure facility. Packard used three actuarially-

based risk assessment tools to evaluate Taylor: the Static-99, the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R), and the Sex Offender Risk Appraisal Guide (SORAG). The Static-99 test showed that Taylor had a 52 percent likelihood of reoffending within 15 years of release. The MnSOST-R showed Taylor had a 73 percent likelihood of reoffending within 6 years of release. The SORAG showed that Taylor had an 80 to 89 percent likelihood of reoffending within 10 years of release. In other words, all three tests showed that Taylor was more likely than not to reoffend.

¶16 Jackson testified that the Static-99, the MnSOST-R, and the SORAG instruments, and other tests are among those commonly used to assess an individual's risk of recidivism. He said, "[R]outinely, the Static-99 is the most popular with probably the MnSOST-R coming after that." RP at 467. He also claimed that he prefers to use the Static-99 test because it is more reliable, and he testified at length about the strengths and weaknesses of all of the tests Packard relied on. When asked about the sexual sadism and paraphilia diagnoses on cross-examination, Jackson did not dispute them. And, although he had not assessed Taylor for sexual sadism, Jackson stated that Taylor "basically meets the minimum requirements of sexual sadism." RP at 556.

## ANALYSIS

### I. Civil Commitment for Sexually Violent Predators

¶17 Washington law allows the State to indefinitely confine offenders likely to "engage in sexually violent behavior." RCW 71.09.010. Under this legislation, the court may civilly commit a person if it determines that he or she is an SVP beyond a reasonable doubt. RCW 71.09.060.

¶18 Under RCW 71.09.020(16), an "[SVP]" is "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage

in predatory acts of sexual violence if not confined in a secure facility." Prosecuting attorneys may petition for a commitment when an alleged SVP "is about to be released from total confinement." RCW 71.09.030.

## II. Substantive Due Process

¶19  The State violates "[s]ubstantive due process . . . only by 'arbitrary conduct shocking to the conscience.'" *State v. Hoisington*, 123 Wn. App. 138, 146, 94 P.3d 318 (2004) (quoting *Estate of Lee v. City of Spokane*, 101 Wn. App. 158, 170, 2 P.3d 979 (2000)), *review denied*, 153 Wn.2d 1031 (2005); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998). Taylor argues that the State violated his right to substantive due process by waiting until two days before his anticipated release before petitioning for civil commitment. He claims that the delay "is without justification and should shock the conscience of the court" because the State deprived him of the opportunity to participate in further sex offender treatment, which may have enabled him to avoid civil commitment. Br. of Appellant at 20.

¶20  The State counters that not only did the timing of its petition comply with the civil commitment statute, but it also allowed Taylor the maximum time to receive treatment before he was evaluated.

¶21  Division Three of this court considered a similar argument in *Hoisington*. There, a sexually violent offender was scheduled to be released on August 23, 2000. *Hoisington*, 123 Wn. App. at 141. On that day, the offender appeared before the superior court for resentencing on 1991 second degree rape and second degree burglary convictions. *Hoisington*, 123 Wn. App. at 140 (citing *In re Pers. Restraint of Hoisington*, 99 Wn. App. 423, 993 P.2d 296 (2000)). Concurrently, the State filed a petition alleging the defendant was an SVP who should be committed under chapter 71.09 RCW. *Hoisington*, 123 Wn. App. at 140-41.

¶22 Hoisington argued that "RCW 71.09.030 violates due process because it provides for filing of the SVP petition when the defendant is 'about' to be released from prison." *Hoisington*, 123 Wn. App. at 145. Although the court held that the defendant had not sufficiently briefed the constitutional issue, it commented, "[The defendant] merely speculates things might have turned out better for him had the State filed the petition much earlier during his incarceration." *Hoisington*, 123 Wn. App. at 145. The court also noted that "the State did exactly what the statute authorized, and [the defendant] has not cited any verifiable facts showing he was prejudiced by the filing of the petition as he was 'about' to be released." *Hoisington*, 123 Wn. App. at 146. Taylor's argument suffers from the same flaws.

¶23 Taylor does not claim that RCW 71.09.030 itself violates substantive due process; instead, he suggests that the State's interpretation of the statute and actions under it violate substantive due process. But the plain language of RCW 71.09.030 clarifies that the State may file a petition when it appears that a sexually violent offender "is about to be released from total confinement." RCW 71.09.030. The *"about to be released"* language shows that the legislature intended to allow the State to file at the end of an incarceration so that a sex offender can receive all the treatment available during the incarceration. Accordingly, the State did not abuse its statutory authority by filing two days before Taylor was scheduled for release.

¶24 Further, like the defendant in *Hoisington*, Taylor has not shown any prejudice by the State's filing date. In fact, Taylor availed himself of all of the treatment programs the corrections facilities had to offer, spending more time in therapy than the average offender. The State's last minute filing allowed Taylor every opportunity available to improve his condition before being evaluated for possible SVP status.

¶25 We conclude that Taylor has not shown that the State's actions were either arbitrary or shocked the con-

science such that they violated substantive due process rights.

## III. *Frye* Hearing

¶26 Taylor argues that the trial court erred under *Frye*, Evidence Rule 403, and Evidence Rule 702 when it admitted Packard's testimony about the actuarial tests he used to evaluate Taylor for future dangerousness. The State counters that Taylor failed to move for or request a *Frye* hearing and he did not object to Packard's testimony that relied on the actuarial tests; thus, he did not preserve the issue for appeal. The State also reminds us that Taylor's own expert, Jackson, acknowledged that he uses the same actuarial tests on which Packard relied and that these tools are generally accepted in the field.

¶27 When a party fails to raise a *Frye* argument below, a reviewing court need not consider it on appeal. *See State v. Hettich*, 70 Wn. App. 586, 592, 854 P.2d 1112 (1993); *see also State v. Newbern*, 95 Wn. App. 277, 289, 975 P.2d 1041 (1999) (holding that because the defendant did not invoke *Frye* or otherwise argue that the evidence was not accepted within the scientific community and because he did not raise a constitutional argument, the court declined to review the issue on appeal). Taylor did not object to Packard's testimony or raise a *Frye* issue below. Accordingly, he has waived the issue on appeal. Furthermore, even if Taylor had raised a *Frye* issue below, it would have failed on the merits.

¶28 The *Frye* standard requires a trial court to determine whether a scientific theory or principle " 'has achieved general acceptance in the relevant scientific community' " before admitting it into evidence. *In re Det. of Thorell*, 149 Wn.2d 724, 754, 72 P.3d 708 (2003) (quoting *In re Pers. Restraint of Young*, 122 Wn.2d 1, 56, 857 P.2d 989 (1993)), *cert. denied*, 541 U.S. 990 (2004). " 'The core concern . . . is only whether the evidence being offered is based on established scientific methodology.' " *Thorell*, 149 Wn.2d at 754 (quoting *Young*, 122 Wn.2d at 56).

¶29 In *Thorell*, the Washington Supreme Court considered "whether actuarial instruments may be admitted to aid in the prediction of future dangerousness and, if these instruments are admitted, whether *Frye* or Evidence Rule (ER) 702 is the appropriate test of their reliability." *Thorell*, 149 Wn.2d at 730 (footnote omitted). The court held that "actuarial instruments may be admitted if they satisfy the requirements of ER 702." *Thorell*, 149 Wn.2d at 731.

¶30 The *Thorell* court noted that "[b]ecause actuarial models are based on statistical analysis of small sample sizes, they have a variety of potential predictive shortcomings." *Thorell*, 149 Wn.2d at 753. The parties disputed whether actuarial tests depended on novel scientific evidence. *Thorell*, 149 Wn.2d at 754. The State contended that "actuarial instruments are not novel scientific evidence, so the trial court need not conduct a *Frye* hearing." *Thorell*, 149 Wn.2d at 754. The State also maintained that "the methods and procedures used to construct actuarial instruments are well accepted in the scientific community and that [the defendant's] arguments go to weight rather than admissibility." *Thorell*, 149 Wn.2d at 754. The court concluded that "we reiterate that the *Frye* standard has been satisfied by . . . actuarial determinations of future dangerousness." *Thorell*, 149 Wn.2d at 756.

¶31 *Thorell* concerned the consolidated petitions of six persons who were civilly committed under chapter 71.09 RCW; and the actuarial tests the court considered in *Thorell*, like in this case, concerned the risk of reoffense by SVPs. *Thorell*, 149 Wn.2d at 731. Nevertheless, Taylor suggests that *Thorell* can be distinguished because "[g]eneral acceptability is not satisfied '[I]f there is a significant dispute between qualified experts as to the validity of the scientific evidence.' " Br. of Appellant at 24, 28 (quoting *State v. Kunze*, 97 Wn. App. 832, 853, 988 P.2d 977 (1999)). But Taylor's own expert testified that the actuarial tests at issue are generally accepted within the scientific community.

## IV. Ineffective Assistance of Counsel

¶32 Taylor argues that his counsel was ineffective for failing to obtain an expert to rebut Packard's testimony regarding the baseline and margin of error in the MnSOST-R, Static-99, and SORAG tests. The State argues that Taylor has failed to satisfy either prong of the *Strickland*[2] test. We agree with the State.

¶33 Under *Strickland*, Taylor must show that (1) his counsel's conduct fell below an objective standard of reasonableness and (2) but for counsel's deficient assistance, a reasonable probability exists that the outcome would have differed. *In re Det. of Stout*, 128 Wn. App. 21, 28, 114 P.3d 658 (2005). An attorney's legitimate trial strategy or tactics cannot constitute ineffective assistance. *Stout*, 128 Wn. App. at 28.

¶34 Taylor bases his argument on the Trowbridge article,[3] which critiques risk assessments for elderly sex offenders. He posits, "A[s] noted by Dr. Trowbridge, the predictions derived from actuarials 'may not be very accurate in low base-rate situations, such as the reoffense rates of elderly sex offenders.'" Br. of Appellant at 35. He argues that he was denied the right to effective assistance of counsel because his counsel failed to:

> [O]btain expert witnesses to rebut the testimony of Dr. Packard regarding the margin of error in the three actuarial instruments he used to predict Taylor's risk of reoffending, and more specifically, the base line of offenses that would normally be seen in a population of persons Taylor's age and background.

Br. of Appellant at 34-35. He emphasizes, "If Dr. Jackson was not able to speak authoritatively regarding the issue, counsel had a duty to request the services, at public expense, of an [expert] to explain *why risk assessments may not be accurate.*" Br. of Appellant at 35 (emphasis added).

---

[2] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[3] Brett Trowbridge, *Age and Recidivism: How Accurate Are Our Predictions?*, 18 WASH. CRIM. DEF. 4 (Nov. 2004).

¶35 First, it was reasonable that Taylor's trial counsel did not present expert opinion on Trowbridge's theory because the article concerns elderly sex offenders; at the time of Taylor's trial, he was 38 years old. More importantly, Trowbridge's article had not even been published at the time of the trial. And Taylor presents no argument and makes no assertion that Trowbridge's theory was generally accepted in the scientific community before his article was published. The later-published Trowbridge article affords no support for Taylor's claim that his counsel should have somehow raised Trowbridge's points.

¶36 And Taylor's counsel did call an expert to critique the accuracy of the actuarial tests. Jackson testified about the strengths and weaknesses of the actuarial tests Packard used as well as discrepancies in scoring on those tests. He also explained what an actuarial test is and which of the actuarial instruments are most popular. And he testified that he prefers to use the Static-99 because it is more reliable.

¶37 For example, when comparing the SORAG with the Static-99, Jackson testified:

> [The SORAG] had a larger diversity of the population. It also was a population studied in the United States where the Static-99 and a lot of the population was Canadian or United Kingdom. . . . [But] the SORAG . . . has a . . . lower interrater reliability. In other words, there is—it's a little bit more complicated [to] score than the Static-99, so we would expect different examiners to get a little bit larger discrepancy. Also calls for some—a little bit more subjective evaluation than, like, the Static-99, which is a hundred percent, almost a hundred percent objective in nature.

RP at 482.

¶38 Jackson also testified that the Static-99 test was based on a much larger population than the SORAG—1,301 persons—and he explained that it was derived from the Rapid Risk Assessment for Sexual Offender Recidivism, "which had a population of about twice that, and then that was based on the Hanson and Bussiere study." RP at 483.

He concluded that the Static-99 is a much bigger and better version than those earlier tests, and he emphasized that "it's also been cross-validated on 22 different studies, three of which are in the United States." RP at 483. He noted that the weakness of the Static-99 is that it is not one "hundred percent" reliable. RP at 484. For example, "a score of four on the Static-99 is considered unstable, and that's because of a real large base rate for that particular score. But the interrater reliability is fairly consistent, much better than the MnSOST-R." RP at 484.

¶39 Jackson also criticized the MnSOST-R because it was "based on a population of only 256, which is a pretty small population." RP at 485. He said, "If you're doing an assessment instrument, the more individuals we have in that study, the better it is." RP at 485. He also noted that the MnSOST-R has been cross-validated only three times— "showing pretty poor results as far as reliability is concerned." RP at 485.

¶40 Defense counsel also had Jackson score Taylor under the Static-99 while on the witness stand. The exercise showed that Jackson and Packard scored Taylor differently using the Static-99—even though it is based on objective factors. She also had him score Taylor under the MnSOST-R. Again, Jackson's scores differed from Packard's. In fact, Jackson's score for Taylor under the MnSOST-R reflected that Taylor poses a moderate risk for reoffense; whereas, Packard's score for Taylor showed that he poses a high risk for reoffense. He also discussed other discrepancies in scoring.

¶41 Thus, Taylor has not shown, as he asserts in his brief, that "the defense utterly failed to rebut Dr. Packard's testimony regarding the risk assessment instruments." On the contrary, Jackson provided considerable critical testimony about the reliability of the tests and Packard's application of them to Taylor. Taylor has not shown that counsel was deficient.

## V. Less Restrictive Alternatives

¶42 Taylor acknowledges that in *Thorell*, the Washington Supreme Court effectively relieved the State of its previous obligation to prove that Taylor was not safe to be released to a less restrictive alternative to total confinement. Claiming that the *Thorell* court erred when it so ruled, he preserves the issue for appeal to the United States Supreme Court.

¶43 Affirmed.

QUINN-BRINTNALL, C.J., and VAN DEREN, J., concur.

Review denied at 159 Wn.2d 1006 (2007).