FILED
COURT OF APPEALS
DIVISION II

2014 AUG 12 PM 12: 45

STATE OF WASHINGTON

BY_____
             DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| IN RE DETENTION OF | No. 44137-3-II |
| MORGAN A. HEATH. | UNPUBLISHED OPINION |

HUNT, J. — Morgan A. Heath appeals the trial court's order for civil commitment as a sexually violent predator (SVP) under chapter 71.09 RCW[1]. He argues that the trial court (1) abused its discretion in denying his motion for mistrial based on juror misconduct; and (2) violated his right to a unanimous jury verdict (a) in failing to instruct the jury that it must be unanimous about the underlying reason for its finding him likely to reoffend and (b) because the State failed to offer sufficient evidence to prove that Heath suffered from a mental abnormality or specific personality disorder that would make him likely to reoffend. We affirm.

## FACTS

### I. BACKGROUND

In 2003, Morgan A. Heath molested a two-year-old girl, the daughter of his father's girlfriend, four or five times over a few months; Heath was 14 years old at the time. Based on these acts, Heath pled guilty to first degree rape of a child and was sentenced to Juvenile

---

[1] "Sexually violent predator means any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18).

Rehabilitation Administration (JRA) for a period of 15 to 36 weeks. After completing his JRA sentence, Heath was released on community supervision.

Heath violated the terms of his community supervision by committing theft and false reporting in 2004. Between December 2004 and August 2006, Heath was convicted for assaulting his girlfriends; thereafter, Heath violated no-contact orders for these girlfriends. In January 2007, Heath was charged with failure to register as a sex offender between November 26 and December 14, 2006; he pled guilty, was sentenced to jail for 45 days, and was put under the supervision of a community corrections officer (CCO), Nancy Jo Nelson, for 12 months. In July 2007, Heath was again arrested for failure to register as a sex offender and for various violations of his community supervision conditions, including contact with a minor child. In April 2008, Heath was arrested, and released, for third degree malicious mischief for beating in the windows of his girlfriend's car.

In July, while "released to the community," Heath took a job working at a carnival, which violated his release condition not to be in the presence of minors; he was again arrested. 3 Verbatim Report of Proceedings (VRP) at 249. When he was released from custody on August 9, Heath walked to a festival where he interacted with an eight-year-old boy, put the boy on a horse, and started leading the horse out of the park. Heath was again arrested. Shortly after Heath's release from jail, Nelson put him on GPS[2] monitoring.

In June 2009, Heath was jailed for 61 days for living in an unauthorized location and for going to a mall, where he could pick up young teenage girls, in violation of his community

---

[2] "Global Positioning System" (GPS). 2 VRP at 133.

supervision conditions. In November, Heath was again charged with failure to register and jailed for about 90 days. He was released in February 2010 and again put on GPS monitoring.

Shortly after his release, Heath began violating his community supervision conditions again. Nelson had told Heath he could not stay with his friend, Tammy Brown and her two children, one 13 years old and the other 12 years old. But Heath stayed at Brown's house without informing Nelson; instead, when Nelson called Brown, she lied to Nelson about where he was living. There, he had multiple contacts with multiple children, including a 17-year-old girl, eight to ten other children at Brown's apartment complex playground, a 10-year-old developmentally disabled girl, and three other minor children. While playing with children at the playground, Heath gave them "piggyback rides"; made sexual innuendos to them; and, when a dog started "humping" Heath's leg, told the children to get down on their hands and knees to mimic the dog's behavior. 3 VRP at 253. When Nelson learned that Heath was staying with Brown and her children, she arrested him for several community supervision violations.

Nelson then learned that also in February 2010, Heath had sexually assaulted two 13-year-old girls, JR and AC,[3] one of whom had been staying at Brown's house. Based on these acts, Heath pled guilty to attempted communication with a minor for immoral purposes and fourth degree assault with a special allegation of sexual motivation. He was sentenced to 214 days in JRA, to run concurrently with his previous sentence, followed by a two-year probation; the court also issued a no contact order with JR or AC.

---

[3] It is appropriate to provide some confidentiality in this case. Accordingly, we use initials to identify the juveniles involved.

## II. PROCEDURE

On August 30, 2010, while Heath was still incarcerated, the State filed a petition to commit Heath as a sexually violent predator (SVP) under RCW 71.09 *et seq.* The case proceeded to a jury trial.

### A. Trial

#### 1. CCO Nancy Jo Nelson's testimony

Heath's CCO, Nancy Jo Nelson, testified that she had supervised Heath from February 2007 until he went to the Special Commitment Center (SCC) in 2010. Nelson described Heath's multiple violations of his conditions of release as previously set forth. Because Heath was again incarcerated, she would continue supervising him on community custody after *"he's finally released again."* 2 VRP at 155.

#### 2. Psychologist Dr. Amy Phenix's testimony

Clinical psychologist Dr. Amy Phenix testified that on August 10, 2010, she had conducted an initial evaluation of Heath to determine whether he had a mental abnormality that predisposed him to committing future criminal sexual acts. Dr. Phenix relied on Heath's criminal legal records, parole violation reports, police reports, charging documents, conviction documents, juvenile custody documents, and Heath's treatment documents. She explained Heath's criminal behavior as previously described. Pertinent facts leading to Dr. Phenix's diagnoses were Heath's pattern and duration of behavior toward prepubescent children, including his reported sexual fondling of a four to five-year-old child when he was 14; sexual molestation, including penetration, of a two-year-old girl with whom he admitted to being sexually interested; and his masturbating to ongoing sexual fantasies about the two-year-old girl even during his

period of treatment. Dr. Phenix diagnosed Heath with pedophilia, a mental abnormality, and two

personality disorders—antisocial personality disorder and borderline personality disorder.

### a. Pedophilia

Dr. Phenix explained that in diagnosing a person with pedophilia[4], she looked for

individuals reporting abnormal sexual fantasies about children, generally age 13 years and

younger. She had studied Heath's behavioral pattern since he raped the two-year-old when he

was 14-years-old. She also considered Heath's subsequent violations of community release

conditions that had involved seeking out and being in the presence of children: (1) After Heath's

July 2008 release from custody back into the community, he had violated his release condition

not to be in the presence of children, when he worked at a carnival; (2) Heath had put an eight-

year-old boy on a horse and started leading the horse out of the park festival a month later; (3)

Heath had spent the night with a friend who had a two-year-old child, deliberately putting

himself in a high-risk situation; (4) Heath viewed pornography; (5) Heath had moved in with

Brown, who had minor children; (6) Heath had given piggyback rides to children and induced

them to mimic a dog's "humping behavior"[5] while playing with the children at a playground in

2010; and (7) Heath had forced sexual acts with two 13-year-old females in 2010. Based on her

---

[4] The State offered for the jury's consideration the *Diagnostic and Statistical Manual of Mental Disorders* (4th rev. ed. 2000) (DSM or DSM-IV-TR) definition of "pedophilia," exhibit 21. 3 VRP at 239. The DSM is an American Psychiatric Association publication that provides criteria for the classification of mental disorders. commonly used by mental health professionals to determine a patient's diagnosis.

[5] 3 VRP at 253.

evaluation, Dr. Phenix concluded "to a reasonable degree of psychological certainty" that Heath had pedophilia. 3 VRP at 256.

### b. Antisocial personality disorder

Dr. Phenix explained that an individual has antisocial personality disorder[6] when he or she violates the rights of others, engages in criminal behaviors, and is generally associated with jail terms, going to prison, and incarceration for criminal behavior. Dr. Phenix also explained that personality disorders can "further sex offending" because such individuals tend to disregard the law. 3 VRP at 258.

Dr. Phenix diagnosed Heath with antisocial personality disorder because of his repeated failures to conform to social norms with lawful behaviors: (1) Heath was engaged in a number of domestic violence incidents with various girlfriends; (2) Heath had been in and out of custody since the age of 14; (3) Heath had a striking lack of compliance with community supervision or parole; (4) Heath exhibited deceitfulness by denying his criminal sexual behavior; (5) Heath demonstrated significant impulsivity and an inability to consider the consequences of his behaviors, such as molesting his father's girlfriend's two-year-old daughter; and (6) Heath's uncontrolled violent tendencies resulted in his engaging in fights with teachers and peers in school and being aggressive to his peers in juvenile custody.

Dr. Phenix also assessed Heath on a Hare Psychopathy Checklist-Revised (PCL-R)[7], through a series of interviews and review of past records. Heath scored a 33 out of 40 on the

---

[6] The State also offered the DSM definition of "antisocial personality disorder" as an illustrative exhibit for the jury. 3 VRP at 257.

[7] The State introduced the PCL-R as an illustrative exhibit.

PCL-R, in the high range; this high score signaled to Dr. Phenix that Heath (1) had a high psychopathy, (2) had a stronger than average propensity for violent behavior in the future, (3) would likely engage in future violations of community supervision and a greater than average amount of future sexual criminal behavior, and (4) suffered from a pervasive and "particularly severe" form of antisocial personality disorder. 3 VRP at 271.

### c. Borderline personality disorder

Dr. Phenix also diagnosed Heath with borderline personality disorder.[8] She explained that, unlike antisocial personality disorder, borderline personality disorder focuses more on maladaptive relationships with others and involves an impaired ability to develop and to maintain close friendships and intimate relationships. 3 VRP at 272. Dr. Phenix found that Heath had traits of borderline personality disorder, including lengthy histories of troubled relationships, such as (1) abandonment by his mother; (2) "clingy"[9] behavior with his girlfriends, which led to arrests for stalking; (3) physically assaulting his girlfriends; (4) impulsive behavior and alcohol abuse; (5) suicidal behaviors, a common symptom of borderline personality disorder; and (6) mood instability. Dr. Phenix opined that although borderline personality disorder did not have "the strongest relationship" in this case, it was likely to lead to inappropriate sexual activity because it affects Heath's choice-making and the persons with whom he interacts. 3 VRP at 276. Dr. Phenix reiterated that she had diagnosed Heath with both antisocial personality disorder and borderline personality disorder.

---

[8] The State introduced the definition of "borderline personality disorder" from the DSM-IV-TR as an illustrative exhibit for the jury. 3 VRP at 271.

[9] 3 VRP at 273.

d. "Mental abnormality"

Dr. Phenix then opined about Heath's "mental abnormality."[10] 3 VRP at 277. She explained that "mental abnormality" is a condition that affects either the volitional or emotional capacity of a person, for example, predisposing a person to act out in criminal sexual ways. 3 VRP at 279. Dr. Phenix opined that Heath's pedophilia constituted a mental abnormality that affected his emotional capacity: For example, when Heath tried to engage in sexual intercourse with the two-year-old, he penetrated her; and when she screamed, he said, "If you don't stop screaming, I will push it in farther," demonstrating that Heath could not appreciate the pain he caused to others. 3 VRP at 279. Dr. Phenix also opined that (1) Heath's pedophilia predisposed him to commit criminal sexual acts that menaced the health and safety of others; (2) Heath had a mental abnormality to a reasonable degree of psychological certainty; and (3) Heath had serious difficulty controlling his sexually violent behavior, to which his personality disorders also contributed.

Dr. Phenix further testified that Heath had reoffended in 2010, "has not been out in the community since that time," and had not completed treatment. 3 VRP at 310. Dr. Phenix also considered how safe Heath would be in the community "should he be released" and that Heath had about a year and a half left of parole or community supervision "once he's released." 3 VRP at 311. Dr. Phenix opined that Heath was not "safe to be released to the community until he has sufficient treatment and demonstrated that he can comply with conditions." 3 VRP at 312. Dr.

---

[10] The State offered the definition of "mental abnormality" as an illustrative exhibit for the jury. 3 VRP at 277.

Phenix concluded that Heath is a high risk sex offender and that he should remain confined for treatment. 3 VRP at 313.

### B. Motion for Mistrial

Juror 9 wrote the following note to the trial court one day after trial proceedings:

> [A]t 4:20 pm we as jurors were wanting to leave in jury room. [A] jur[or] said "Is he incarcerated now?" a couple jur[ors] said yes. One jur[or] was talking to a friend jur[or]. She stated something like this may not be exact words "yes he is." I . . . looked to see where he was on the internet and the other jur[or] said "where is he." She shook her head but I did not hear what she said.

Clerk's Papers (CP) at 863. The next day, the trial court held a hearing to address Juror 9's note. Heath moved for mistrial based on possible juror misconduct. The trial court opined that the prejudice was not great enough to declare a mistrial and suggested bringing the jury in to question them individually. The trial court then spoke with Juror 9, who said she had not told anyone she had sent the note to the court. The trial court said it was "going to keep this anonymous from the other jurors." 4 VRP at 325. Next, the trial court called the other jurors individually to ask whether there had been any discussion about a juror's looking up Heath on the internet. All the jurors responded in the negative. Juror 11, who had allegedly done an internet search for Heath, told the court that (1) she had used the Kitsap County website for work but had not looked up anything about Heath; (2) she had told Juror 8 about having been on the Kitsap County website, which she used for work on a daily basis, hence chancing upon Heath's name; and (3) knowing Heath's name showed up on the Kitsap County website would not have impaired her ability to hear the case fairly. Juror 8 reported that (1) he did not hear any jurors talk about looking up Heath on the internet; (2) "somebody said something about they were wondering . . . whether or not he was incarcerated," 4 VRP at 348; and (3) such information

9

would not impact his ability to serve as a juror because he "would assume most people are incarcerated if they are in this situation." 4 VRP at 348. Juror 13 did not hear anything about Heath or anyone talk about searching the internet, but someone had commented about Dr. Phenix's "articulating" speech. 4 VRP at 332.

The trial court decided not to declare a mistrial because (1) the fact of Heath's incarceration was well known to the jury panel; and (2) reinstruction of the jury was sufficient to take care of the issue. Heath's incarceration since February 2010 had come to the jury's attention in many different ways, and there had been no motions in limine to keep such information from the jury. The trial court also noted that Juror 11 was very clear that she had merely made a remark or mention about Heath's possible incarceration and that there had been no discussion beyond that remark. Juror 8 similarly reported that there had been no discussion about Heath's incarceration and that it had been a passing remark.

The trial court again called Juror 13 to clarify the comment about Dr. Phenix; Juror 13 responded there had been a comment about Dr. Phenix's speech being "so articulated," but she (Juror 13) had heard nothing about incarceration. 4 VRP at 355. Heath argued that the juror's comment about Dr. Phenix's being articulate was a comment on the evidence. Disagreeing, the trial court ruled that (1) the comment about Dr. Phenix's speech was not a comment on the evidence or her credibility, but rather about how Dr. Phenix had appeared to the jury; and (2) such a comment did not rise to the level of unfair prejudice that would taint the jury panel. The

trial court then brought in the entire jury, read them the "fair trial"[11] instruction again, and reminded them not to talk or research outside the courtroom. 4 VRP at 365.

### C. Post mistrial motion trial testimony

After the trial court denied Heath's motion for a mistrial, the trial testimony resumed.

### 1. Heath

Heath testified that his half brothers had molested him when he was six years old. Heath described his feelings toward his molestation of the two-year-old girl as "nightmares" and not "fantasies." 5 VRP at 467. Concerning his sexual assaults of the two 13-year–old girls, Heath explained that he had taken an *Alford* plea[12] because he did not think a jury would believe he was innocent, even though the assaults were "something [he] didn't do." 5 VRP at 472. As for the 2004 assault of his ex-girlfriend, Heath stated that although he had pushed her into a car, he did not mean to do so. With respect to his 2005 assault of another ex-girlfriend, Heath denied having tackled her in the school parking lot, even though he had pled guilty. Heath also admitted he worked at the carnival in July 2008. He also explained that he had been incarcerated at the SCC "for a while now." 5 VRP at 471.

---

[11] The instruction stated, in pertinent part:
> It is essential for a fair trial that everything you learn about this case comes to you in this courtroom, and only in this courtroom. There should not be any discussions about anything about the case with any fellow jurors, family members, or friends until you are released from that instruction.
> . . .
> Until you are dismissed, again, at the end of the trial, you must avoid any outside sources such as newspapers, magazines, blogs, the Internet, or radio or television broadcasts.

4 VRP at 365

[12] *North Carolina v. Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

## 2. Dr. Luis Rosell

Dr. Luis Rosell, a psychologist, testified on behalf of Heath, and stated that he did not agree with Dr. Phenix's diagnosis of pedophilia and Dr. Phenix's opinion that Heath was likely to reoffend. Dr. Rosell opined that Heath's sexual assault of the 13-year-olds should not have been considered in Heath's pedophilia diagnosis because their statements were inconsistent. Dr. Rosell did, however, diagnose Heath with antisocial personality disorder.

## 3. AC

AC testified that around February 2010, when she had stayed at Brown's house, Heath had sat on a couch next to her, pinned her down, kissed her, and raped her.

## D. Jury Instructions

When the trial court discussed the parties' proposed jury instructions, Heath requested a *Petrich*[13] instruction; the State objected that such instruction was neither appropriate nor required in SVP cases. Heath told the trial court to "take [his *Petrich* instruction request] under advisement." 6 VRP at 647. The State told the trial court that it had found a case, *In re Det. of Halgren*, 156 Wn.2d 795, 807, 132 P.3d 714 (2006), which stood for the proposition that it was inappropriate in SVP cases to give a *Petrich* instruction. Heath did not object. And the trial court proceeded, without giving a *Petrich* instruction.

The jury found that the State had proved beyond a reasonable doubt that Heath was a SVP. Heath appeals.

---

[13] *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984).

No. 44137-3-II

ANALYSIS

I. JUROR MISCONDUCT

Heath argues that repeated instances of juror misconduct violated his right to a fair trial. Heath specifically asserts that the jurors engaged in misconduct by (1) gathering extrinsic evidence of Heath's incarceration and presenting it to the other jurors; (2) lying about having discussed Heath's incarceration; (3) ignoring the trial court's instruction not to discuss the case or evidence until deliberations; and (4) expressing praise for Dr. Phenix before Heath cross-examined her, and before deliberations, which conduct we should presume was prejudicial. Even assuming, without deciding, that the jury engaged in misconduct, the misconduct that Heath asserts does not warrant a new trial.

A trial court's decision to deny or grant a motion for mistrial is a matter addressed to the sound discretion of the trial court, which we review for abuse of discretion. *State v. Tigano*, 63 Wn. App. 336, 342, 818 P.2d 1369 (1991), *review denied*, 118 Wn.2d 1021 (1992). A trial court abuses its discretion when it acts on untenable grounds or its ruling is manifestly unreasonable. *State v. Barnes*, 85 Wn. App. 638, 669, 932 P.2d 669, *review denied*, 133 Wn.2d 1021 (1997). Litigants are entitled to a fair trial, not a perfect one. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984). As a general rule, an appellate court is reluctant to inquire into how a jury arrived at its verdict. *State v. Balisok*, 123 Wn.2d 114, 117, 866 P.2d 631 (1994). Courts grant a new trial only where juror misconduct[14]

---

[14] The introduction of extrinsic evidence by a juror to fellow jurors is juror misconduct and can be grounds for a new trial. *Balisok*, 123 Wn.2d at 118. Extrinsic evidence is information, oral or documented, that is *outside all the evidence admitted at trial*. *Balisok*, 123 Wn.2d at 118.

13

has prejudiced the defendant. *State v Earl*, 142 Wn. App. 768, 774, 177 P.3d 132, *review denied*, 164 Wn.2d 1027 (2008); *see also* CrR 7.5(a) (new trial warranted only where a "substantial right of the defendant was materially affected[.]").

Heath argues that jury misconduct is presumed prejudicial and that the State failed to prove, beyond a reasonable doubt, that the misconduct could not have affected the jury's verdict. We may presume prejudice on a showing of misconduct; but such a presumption can be overcome by "an adequate showing that the misconduct did not affect the [jury's] deliberations." *State v. Depaz*, 165 Wn.2d 842, 856, 204 P.3d 217 (2009). Here, regardless of whether prejudice is presumed in theory, the alleged misconduct could not have affected the jury's verdict.

First, contrary to Heath's assertion, Juror 11's internet information about Heath's incarceration was not "extrinsic evidence" because the jury had already heard other evidence of Heath's incarceration during trial.[15] *Balisok*, 123 Wn.2d at 118 (extrinsic evidence is information outside *all the evidence admitted at trial*); *Meerdink v. Krieger*, 15 Wn. App. 540, 546, 550 P.2d 42, *review denied*, 87 Wn.2d 1011 (1976) (deliberating juror's factual assertions about amount of damages did not warrant new trial when amount of damages was within the testimony presented at trial).

---

[15] For example, on October 9, the jury heard Heath's deposition clip in which he repeatedly referred to being at the SCC, that he was "locked up," that had no contact with his family since he had been at the SCC, and that he had been incarcerated since about February 2010. CP at 540. Dr. Phenix also testified that (1) Heath "has not been out in the community since" he reoffended in 2010, 3 VRP at 310; (2) Heath would likely reoffend "should he be released," 3 VRP at 311; (3) Heath had about a year and a half left of parole or community supervision "once he's released," 3 VRP at 311; and (4) Dr. Phenix she did not think "that he is safe to be released to the community until he has sufficient treatment and demonstrated that he can comply with conditions." 3 VRP at 312.

Second, the instructions stated that for the jury to find Heath a SVP, the State had to prove that (1) he had been convicted of a crime of sexual violence, here, first degree child rape; (2) he suffered from a mental abnormality or personality disorder that caused serious difficulty in controlling his sexually violent behavior; and (3) his mental abnormality or personality disorder made him likely to engage in predatory acts of sexual violence. All three factors were clearly established independent of any information about Heath's incarceration.

Heath conceded his first degree child rape conviction. Dr. Phenix testified extensively[16], with fact-based support, that to a reasonable degree of psychological certainty, (1) Heath suffered from pedophilia and two personality disorders—antisocial personality disorder and borderline personality disorder; and (2) Heath had a stronger propensity than the average person to engage in violent behavior, violations of community supervision, and a greater amount of future sexual criminal behavior; and (3) Heath's borderline personality disorder would likely to lead to inappropriate sexual activity because it affected his choice-making and with whom he interacted.

We hold that, based on the substantial evidence already before the jury, no juror misconduct prejudiced the outcome of the trial, the jury would have found Heath was a SVP regardless of the alleged juror misconduct, and Heath is not entitled to a new trial on this ground. Therefore, we affirm the trial court's denial of Heath's motion for a mistrial.

---

[16] Heath also asserts that juror misconduct occurred when jurors commented about Dr. Phenix's articulateness during her testimony. Heath provides no authority or further supporting argument for the proposition that expressing praise for an expert witness's articulateness constitutes juror misconduct. Because this asserted error lacks developed supporting argument as RAP 10.3(a)(6) requires, we need not further consider it. Nevertheless, even had Heath developed this argument, he fails to show resulting prejudice.

## II. UNANIMITY INSTRUCTION

Heath next contends that he was denied his right to a unanimous jury because the trial court (1) failed to instruct the jury on the need for unanimity about which of his multiple mental disorders underlay its SVP determination, and (2) the State did not offer sufficient evidence to support each alternative means. This argument fails.

RCW 71.09.060 provides that when a jury determines a person is a SVP, the verdict must be unanimous. Under RCW 71.09.020(18), a SVP is any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality *or* a personality disorder that makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility.

Our Supreme Court has held that (1) the alternative means test applies to SVP proceedings, and (2) the SVP statute allows two alternative means—"mental abnormality" and "personality disorder"—to support a SVP determination. *Halgren*, 156 Wn.2d at 810, 811. Although the State need prove only one alternative means to support a SVP determination, where the evidence is sufficient to prove *both* alternative means (mental abnormality *and* personality disorder) beyond a reasonable doubt, a trial court does not violate the SVP's constitutional right to unanimity by failing to instruct the jury that it must be unanimous about which means it used to support its SVP determination. *Halgren*, 156 Wn.2d at 811, 812. If in addition to or in lieu of the mental abnormality means, the SVP suffers from *two* personality disorders, the jury need not

16

No. 44137-3-II

be unanimous about which personality disorder contributed to its SVP determination. *See In re Det. of Sease*, 149 Wn. App. 66, 78-79, 201 P.3d 1078, *review denied*, 166 Wn.2d 1029 (2009).[17]

Halgren suffered from "at least" one mental abnormality and one personality disorder. *Halgren*, 156 Wn.2d at 800. Halgren argued that the trial court should have instructed the jury that it had to agree unanimously about whether it was his mental abnormality or personality disorder that caused him to be a SVP. *Halgren*, 156 Wn.2d at 807. The Supreme Court rejected this argument because there was sufficient evidence of both the mental abnormality and the personality disorder, noting that "because an SVP may suffer from both defects simultaneously, the mental illnesses are not repugnant to each other and may inhere in the same transaction." *Halgren*, 156 Wn.2d at 810.

To determine whether the jury's SVP verdict was based on substantial evidence of both alternative means here, we must determine whether the evidence, "viewed in a light most favorable to the State, is sufficient to persuade a fair-minded, rational person that the State has

---

[17] More specifically, as we held in *Sease*:

> The SVP statute delineates two alternatives for satisfying the State's burden of establishing a mental condition "which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility"— *mental abnormality or personality disorder*. RCW 71.09.020(16). *There is no dispute that Sease suffered from one or, possibly, two personality disorders.*
>
> As in [*In re Pers. Restraint Petition of Patrick James Jeffries*, 110 Wn.2d 326, 752 P.2d 1338, *cert. denied*, 488 U.S. 948 (1988)], the jury here need only have unanimously found that the State proved that Sease suffered from a personality disorder that made it more likely that he would engage in acts of sexual violence if not confined to a secure facility. *The jury need not have unanimously decided whether Sease suffered from borderline personality disorder or antisocial personality disorder*. Therefore, the trial court did not err in failing to give a unanimity instruction and it is not an error that Sease can raise for the first time on appeal.

*Sease*, 149 Wn. App. at 78-79 (emphasis added).

proved beyond a reasonable doubt that [the defendant] is a sexually violent predator." *State v. Hoisington*, 123 Wn. App. 138, 147, 94 P.3d 318 (2004), *review denied*, 153 Wn.2d 1031 (2005). "The substantial evidence test is satisfied if this court is convinced that 'a rational trier of fact *could* have found each means of [fulfilling the SVP requirements] proved beyond a reasonable doubt.'" *Halgren*, 156 Wn.2d at 811 (quoting *State v. Kitchen*, 110 Wn.2d 403, 410-11, 756 P.2d 105 (1988)).

Here, there was substantial evidence of both Heath's personality disorders *and* his mental abnormality, either of which alternate means would support the jury's determination that Heath is a SVP. Dr. Phenix testified at length about Heath's pedophilia, antisocial personality disorder, and borderline personality disorder. Dr. Phenix also opined, to a reasonable degree of psychological certainty, that (1) Heath's pedophilia constituted a mental abnormality that affected his emotional capacity and predisposed him to commit criminal sexual acts that menaced the health and safety of others; and (2) Heath's personality disorders—antisocial personality disorder (predominantly) and borderline personality disorder—contributed to his sexually violent behavior, which he had serious difficulty controlling. Here, a rational trier of fact could have found each means of being a SVP beyond a reasonable doubt.

Viewing the evidence in the light most favorable to the State, we hold there was sufficient evidence to persuade a fair-minded rational person beyond a reasonable doubt that Heath suffered from both personality disorders and a mental abnormality, each and both of which made him more likely to engage in predatory acts of sexual violence if not confined to a

18

No. 44137-3-II

secure facility. *See Halgren*, 156 Wn. 2d at 811; *Sease*, 149 Wn. App. at 80. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, J.

We concur:

Bjorgen, A.C.J.

Lee, J.

19