187 P.3d 803 (2008)
In the Matter of the DETENTION OF Charles W. POST.
No. 55572-3-1.
Court of Appeals of Washington, Division 1.
July 14, 2008.
*806 Eric Broman, Nielsen Broman Koch PLLC, Seattle, WA, for Appellant.
Brooke Elizabeth Burbank, Assistant Attorney General, Seattle, WA, for Respondent.
DWYER, A.C.J.
¶ 1 Charles Post appeals his commitment as a sexually violent predator (SVP) pursuant to chapter 71.09 RCW, the sexually violent predator act (SVPA). At trial, Post presented evidence of a voluntary community-based treatment program in which he could participate, if released from custody, so as to lessen the likelihood that he would reoffend. In response, the State presented evidence concerning the Special Commitment Center's (SCC) treatment program that would be available to Post only if he was committed as an SVP. Post had voluntarily participated in the first phases of the SCC program and evidence of his unsatisfactory performance in the program was presented by the State. In addition, the State presented evidence to the jury regarding the content of subsequent treatment phases in which Post had not participated. The State also presented to the jury evidence of potential less restrictive alternatives (LRAs) to confinement, such as release with conditions, that might also be ultimately available to Post, but only if he were first committed as an SVP.
¶ 2 We hold that the trial court erred by admitting evidence regarding potential LRAs and the content of the SCC treatment program phases in which Post had not participated. Such evidence was not relevant to the issues before the jury, but was highly and unfairly prejudicial to Post. Admission of this evidence allowed the jury to premise its verdict on considerations of the desirability of the LRAs and SCC treatment phases available to Post only if he was first committed as an SVP, rather than focusing the jury's attention on the question before it: whether the State had proved that Post was an SVP. Accordingly, we reverse the judgment committing Post as an SVP and remand the cause to the trial court for further proceedings.

I
¶ 3 The day before Post was scheduled for release from a prison term he began serving in 1988, the State filed a petition requesting that he be committed as an SVP. Ultimately, two trials were held. In the first, the parties agreed to exclude any evidence concerning the SCC program and Post's participation in the program. The first trial ended with the jury deadlocked, resulting in the declaration of a mistrial.
¶ 4 The second trial included 14 days of testimony from 12 State witnesses and 23 defense witnesses, including multiple expert witnesses for both sides. Each of the lead expert witnesses reviewed between 13,000 and 14,000 pages of records related to Post. To prove that Post had committed a crime of sexual violence, the State relied on evidence that Post was convicted of two counts of rape in 1974 and one count of rape in the first degree in 1988. Post did not dispute the existence of these convictions.
¶ 5 Post served part of his criminal sentence at Twin Rivers Corrections Center (Twin Rivers) where he participated in a sexual offender treatment program. However, Post was transferred out of Twin Rivers to another institution after having been found to have committed two infractions at Twin Rivers. Later, Post participated in the SCC's sex offender treatment program, reaching phase two of a six-phase program by the time of trial.
¶ 6 Post moved, in limine, pursuant to ER 401[1] and ER 403,[2] to exclude all evidence *807 regarding the SCC treatment program, including evidence regarding the phases of treatment in which he had participated, as well as evidence of any potential LRAs. The trial court denied each request.[3] Post unsuccessfully moved for reconsideration, arguing that, at most, the only evidence that was potentially relevant was evidence of Post's behavior in the SCC treatment phases in which he had participated, rather than evidence concerning the entire SCC program.[4]
¶ 7 At trial, Dr. Les Rawlings, a State's expert witness, testified that Post suffered from paraphilia, not otherwise specified, nonconsent or rape (paraphilia NOS rape). Dr. Sally Wing, Post's proposed community treatment therapist, also testified that Post suffered from paraphilia NOS rape. The parties presented conflicting evidence regarding the propriety of a diagnosis of paraphilia NOS rape and the necessary criteria to be considered in determining such a diagnosis. Defense expert witness Dr. Theodore Donaldson, a clinical psychologist specializing in forensic psychology, testified that there was insufficient evidence to conclude that Post met the essential features of the paraphilia diagnosis. Dr. Donaldson also testified *808 that there was no known reliability or validity for the diagnosis of paraphilia NOS rape.
¶ 8 There was also extensive testimony as to whether Post's age, 50, would reduce his risk of reoffense. Several experts testified that, generally, rates of recidivism reduce as sexually violent offenders age. The expert witnesses disagreed as to the accuracy of cited studies and actuarial instruments when applied to someone of Post's age.
¶ 9 Post presented extensive evidence regarding his proposed voluntary treatment program, including the testimony of several members of his proposed support team. Forensic psychologist Dr. Louis Rosell, testifying on behalf of Post, asserted his belief that Post would comply with the voluntary community treatment program. Dr. Rosell's opinion was partially premised on Post's then-current treatment participation and program compliance. Dr. Rosell conceded that a significant weakness of Post's proposed treatment plan was that it was not mandatory but was, instead, premised on Post's purported desire to see it through to fruition.
¶ 10 SCC forensic therapist Jim Anderson, testifying on behalf of the State, described the SCC treatment program. Anderson explained:
Treatment is divided into a series of phases of treatment and there are a total of six phases in the treatment program, ranging from one to six. The first phase is a beginning entry phase; and then progressing through the sixth phase of treatment, that's when it's considered that the residents are  will soon be considered, or likely to be considered, for a conditional release into the community.
Verbatim Report of Proceedings (VRP) (Dec. 7, 2004) at 41. Anderson testified in detail about each of the six phases of the SCC treatment program. At the time of trial, Post was in phase two of the SCC program. Before Anderson began explaining phase three, Post objected. A sidebar was held. The trial court then overruled the objection. Anderson then described in detail the different aspects of the treatment program:
Q. And the Community Transition Module, is that focused on preparing the individuals to (inaudible) the community?
A. Yes, it is.
Q. (Inaudible/tape damage) at that time that the individual will be back in the community with tight court ordered supervision?
A. That is the expected, yes.
. . . .
Q. And looking at the Relapse Prevention VII, it's subtitled Discharge Planning, what does that pertain to?
A. By the time that the resident gets to these advanced phases, they have demonstrated an ability to manage their . . . their risk to reoffend. So the relapse prevention, the advanced relapse prevention class, really looks at a lot of real world scenarios that the resident will face if he gets conditionally discharged, that he'll have to face in the community. So it's a very much reality based planning for how to deal with relapse in the community.
. . . .
Q. So is it fair to say the goal of the treatment program is to integrate the individual back into the community while under supervision?
A. Yes and no. The ultimate goal is no more victims, and the secondary goal is to successfully transition the individual back into the community.
Q. And in phase 6, the individual will be ongoing in treatment while on court ordered conditions of release, is that right?
A. That is correct.
VRP (Dec. 7, 2004) at 49-51.
¶ 11 On re-direct examination, Anderson further testified concerning conditional release:
Q. Now [Defense Counsel] asked you about individuals. No individual has been released from the Special Commitment Center unconditionally, is that correct?
A. That's correct.
Q. And that means that no one who has been found to be a sexually violent predator has been later found no longer to be a sexually violent predator, is that what that means?

*809 A. That's partly how I understood that question, yes.
Q. But there have been many individuals who have been released on conditions; is that correct?
A. That is correct.
Q. And that means that they're released with court supervision, correct?
A. That's correct.
Q. And that supervision includes electronic monitoring?
A. It can.
Q. It includes a CCO or Parole Officer?
A. It can.
Q. And it includes treatment in the community under the umbrella of the court, correct?
A. Yes, it does.
VRP (Dec. 7, 2004) at 113-14.
¶ 12 Near the end of Anderson's testimony, individual jurors posed questions for him regarding the SCC program,[5] including the following: "Approximately how many residents who have been committed to the SCC have completed the program and [been] released?"[6] Anderson answered, "Ones who have completed the program and been released. To tell you the truth I'd only be guessing, I don't really know. I'm thinking 8-10." VRP (Dec. 7, 2004) at 119.
¶ 13 Later in the trial, the following exchange took place during the State's cross-examination of Dr. Rosell:
Q. [D]on't you think that the community would be better protected if Mr. Post completed the treatment program at the SCC?
[Defense Counsel]: Objection.
The Court: Objection sustained.
[Defense Counsel]: Move to strike.
The Court: The jury will disregard.
Q. Well, is it your understanding that if Mr. Post completes the treatment program at the SCC that then he could be released with court supervision?
[Defense Counsel]: Objection.
The Court: Objection sustained.
[Defense Counsel]: Move to strike.
The Court: Jury will disregard. There will be instructions to the jury on the law.
VRP (Dec. 9, 2004) at 126-27.
¶ 14 After the conclusion of testimony, Post proposed two similar, alternate versions of a proposed limiting instruction that would have directed the jury that jurors "may not vote to commit Mr. Post merely because you would prefer that he have conditions upon his release or that you prefer the Special Commitment Program to his voluntary program."[7] In determining not to give either limiting instruction, the trial court discussed its ruling on how the evidence concerning the SCC's treatment program could be utilized by the jury:
I struggled long and hard with how we were going to deal with treatment issues because in some ways it would be purer to *810 not have treatment be such a focus, but the defense, of course, under 71.090.60 has an absolute right to establish that there's a voluntary treatment plan. That is one of the reasons that it is not necessary for Mr. Post to be confined in a secure facility, and, of course, that's what the relevance of the treatment plan is, or the testimony about the circle of friends, and the various other things that Mr. Post has in place is that in some ways, even assuming he has a mental abnormality that makes him likely [to] reoffend, he doesn't need to be in a secure facility to have that [chain] of causation interrupted.
I could not come up with a limiting instruction that was appropriate. Both sides introduced a fair amount of testimony concerning treatment. I am not expecting the State to argue that they don't have to meet the three statutory requirements, and that he should be committed only because treatment would be better. That's not the law and I will sustain an objection if that's where we get, but there is no real way given the scope of treatment information that was presented by both sides to limit it as I initially thought we would, and my initial thought is we were going to be limiting SCC testimony through the formal [sic] director . . . as sort of the abstract program. Instead, it came through Mr. Anderson. It came in this sort of different way, and I think that just changed the tenor of the case and I'm not giving a limiting instruction.
VRP (Dec. 14, 2004) at 48-49 (emphasis added).
¶ 15 In rebuttal closing argument, the State argued that "Mr. Post's best chance of reducing his risk before he's released is to complete the treatment program at the SCC." Post objected. The trial court responded by instructing the jurors that they "will decide the case based on the elements the State is required to prove beyond a reasonable doubt. This is argument as to how the standard is to be applied." VRP (Dec. 14, 2004) at 196. Immediately following this instruction, the State closed the trial by arguing:
Charles Post's best chance to reduce his chance for recidivism is to stay in a secure facility and complete the treatment program. That way he can learn his offense cycle, he can put together a relapse prevention plan that is based on the offense cycle, and his family and friends can know him for what he really is.
VRP (Dec. 14, 2004) at 196-97. The jury returned a verdict finding Post to be an SVP. The trial court ordered him committed.

II
¶ 16 Post contends that evidence concerning the SCC treatment program and evidence regarding the possibility of his conditional release, after completing the SCC program, were not relevant to the issues in the case and were unfairly prejudicial to him.[8] In reply, the State argues that this evidence "helped the jury weigh the sufficiency of the `voluntary treatment option'  a central aspect of the defense  by contrasting the strength of appellant's evidence against a treatment program for high-risk sex offenders." Br. of Resp't at 36.
¶ 17 We first must identify the evidence that is at issue. At trial, to support his contention that he was not likely to reoffend, Post presented evidence of his proposed voluntary community treatment program.[9] *811 Thus, evidence of Post's past performance in treatment was material to the question of whether Post's planned participation in his proposed program would, in fact, tend to prove that he was not "likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(16). To the extent that Post's prior treatment performance had been unsatisfactory, evidence of this past performance tended to prove that his future voluntary treatment would not achieve the desired result. Because Post voluntarily participated in the first two phases of the SCC treatment program, evidence of the content of these two phases, and evidence of Post's performance in them, was relevant.
¶ 18 Of concern on appeal is the relevance of evidence concerning the content of the remaining four phases of the SCC program, in which Post did not participate, as well as evidence that, should he first be committed as an SVP, Post could be conditionally released in the future. To determine whether this evidence was relevant, we must consider the elements that the State is required to prove beyond a reasonable doubt in order to establish that someone is an SVP: (1) that the respondent had been convicted of or charged with a crime of sexual violence; (2) that the respondent suffers from a mental abnormality or personality disorder; and (3) that such mental abnormality or personality disorder makes the respondent likely to engage in predatory acts of sexual violence if not confined in a secure facility. RCW 71.09.020(16); In re Det. of Audett, 158 Wash.2d 712, 727, 147 P.3d 982 (2006).
¶ 19 Evidence concerning the final four phases of the SCC program, in which Post did not participate, and evidence regarding potential future less restrictive alternatives to total confinement were not relevant to the jury's determination of whether Post was proved to be an SVP. As our Supreme Court has explained:
The trier of fact's role in an SVP commitment proceeding . . . is to determine whether the defendant constitutes an SVP; it is not to evaluate the potential conditions of confinement. . . . The particular DSHS facility to which a defendant will be committed should have no bearing on whether that person falls within [the statutory] definition of an SVP.
In re Det. of Turay, 139 Wash.2d 379, 404, 986 P.2d 790 (1999).
¶ 20 The California Court of Appeals has reached a similar conclusion. In People v. Rains, 75 Cal.App.4th 1165, 89 Cal. Rptr.2d 737 (1999), a jury found Rains to be an SVP, within the meaning of California's sexually violent predator act.[10] At trial, the State's expert testified that, if Rains was found to be a sexually violent predator, he would be civilly committed to a psychiatric facility and would receive treatment there with his progress reviewed every two years. Rains, 75 Cal.App.4th at 1171, 89 Cal.Rptr.2d 737. The expert also testified about the type of treatment Rains would expect to receive at the facility. Rains, 75 Cal.App.4th at 1171, 89 Cal.Rptr.2d 737.
¶ 21 On appeal, the court held that the consequence of a finding that someone is an SVP has no relevance to the question of whether the person has a diagnosed mental disorder or whether such a disorder makes the person a danger to the health and safety of others in that it is likely that the person will engage in sexually violent criminal behavior. Rains, 75 Cal.App.4th at 1169, 89 Cal.Rptr.2d 737. Thus, the trial court was held to have erred by admitting such evidence.
¶ 22 Our legislature has specifically delineated several issues as being proper for jury consideration. In addition to the elements the State must prove in order to meet its burden of proving that a person meets the definition of a sexually violent predator, the legislature has also provided that respondents *812 in such proceedings have a right to present evidence of proposed voluntary treatment options in order to attempt to counter the State's contention that they are likely to reoffend if not committed to a secure facility. See RCW 71.09.060(1); In re Det. of Thorell, 149 Wash.2d 724, 751, 72 P.3d 708 (2003). Significantly, in specifically allowing for a respondent to present such evidence, the legislature did not choose to provide the State with statutory authority to present to the jury evidence of treatment programs or opportunities that would be available to the respondent only if he were committed as an SVP or conditions of release that could be imposed on him after such a committal. To the contrary, the legislature specifically limited the fact finder at the commitment hearing "to the consideration of `placement conditions and voluntary treatment options that would exist for the person if unconditionally released from detention.'" Thorell, 149 Wash.2d at 751, 72 P.3d 708 (quoting RCW 71.09.060(1)) (emphasis added). Our Supreme Court has upheld this statutory prohibition on the consideration of potential LRAs at the commitment trial:
[A] fact finder may consider evidence that voluntary treatment on unconditional release is appropriate. Because this goes to whether the definition of SVP is met, the individual may bring this evidence in defense of commitment. The SVPA restricts the court, from ordering an LRA prior to a hearing under the annual LRA review provision, RCW 71.09.090, following initial commitment. RCW 71.09.060(4). Because of this restriction on the trial court, those who meet the statutory definition and are committed as SVPs are not entitled to consideration of LRAs until their first annual review.
Thorell, 149 Wash.2d at 751, 72 P.3d 708.
¶ 23 By presenting evidence concerning his proposed voluntary treatment program, Post put at issue the question of whether he would successfully complete the program and whether such completion would render him not "likely to reoffend." However, these are not the same questions as the question of whether his proposed program is better or worse than the program available to him only if the jury first authorizes his commitment as a sexually violent predator. This latter question was not properly before the jury. Nevertheless, the trial court admitted evidence on this question and allowed the State to argue the significance of this question to the jury. In so doing, the trial court erred.
¶ 24 Without question, when Post introduced evidence concerning his proposed voluntary community treatment program, the State should have been allowed to attempt to discredit the efficacy of the proposed program and the true level of Post's commitment to successful completion thereof. At trial, this, in fact, took place. The State attacked Post's proposed program in numerous ways. On cross-examination, Dr. Wing, Post's proposed community treatment provider, testified that Post had not yet begun working with her. Thus, various aspects of treatment, including the training of Post's support team as part of developing a relapse prevention program, had yet to begin. Dr. Wing acknowledged that members of Post's proposed support team, including Post's mother, did not believe that Post suffered from a mental abnormality that caused him to sexually assault women. Dr. Wing admitted that these support team members appeared to believe Post's explanation that his attacks were motivated by a desire to rob his victims and that the rapes occurred as a mere afterthought. Dr. Wing admitted that she did not share this belief. Thus, she conceded that she needed to work with Post's support team to ensure that they developed a realistic comprehension of Post's sexual deviance and his offense cycle.
¶ 25 On cross-examination, defense expert Dr. Rosell testified that a study of recidivism rates of individuals who had been in institutional treatment programs showed that sex offenders who completed treatment reoffended at a rate of approximately 10 percent as compared to a 17.3 percent reoffense rate for those offenders who never completed treatment. Dr. Rosell also testified that a study of community-based treatment programs found the same recidivism rate, 21 percent, for those offenders who had completed community-based treatment and those offenders who did not complete any treatment program *813 at all. This testimony was material to the efficacy of Post's proposal. In addition, Dr. Rosell testified that Post had never completed any treatment program in which he had enrolled. Moreover, Dr. Rosell acknowledged that a significant weakness of Post's proposed treatment plan was that it was voluntary, rather than mandatory, and was thus completely dependent on Post's willingness to complete it.
¶ 26 Thus, the State was afforded numerous proper avenues to call to the jury's attention deficiencies in Post's proposed voluntary community treatment program. However, by admitting evidence of the SCC program as an alternative to Post's proposed program, and then by declining to instruct the jury as to any limitation on the evidence's use in answering the questions put to the jury, the trial court erred.[11]
¶ 27 After declining to give either limiting instruction proposed by Post, the trial court stated, "I am not expecting the State to argue that they don't have to meet the three statutory requirements, and that he should be committed only because treatment would be better." VRP (Dec. 14, 2004) at 48-49 (emphasis added). However, the State made exactly this argument  and was allowed to do so under the instructions given to the jury.
¶ 28 In rebuttal closing argument, the State informed the jury that "Mr. Post's best chance of reducing his risk before he's released is to complete the treatment program at the SCC." VRP (Dec. 14, 2004) at 196 (emphasis added). When Post objected, the trial court did not sustain the objection but, instead, instructed the jury that it should "decide the case based on the elements the State is required to prove beyond a reasonable doubt. This is argument as to how that standard is to be applied." VRP (Dec. 14, 2004) at 196. The State immediately again argued that "Charles Post's best chance to reduce his chance for recidivism is to stay in a secure facility and complete the treatment program." VRP (Dec. 14, 2004) at 196-97 (emphasis added). This argument, which was not directed to the "elements the State is required to prove beyond a reasonable doubt," closed the trial.
¶ 29 The central issue before the jury was whether Post was proved to be more likely to reoffend if he was not confined in a secured facility. The issue was not whether Post had a better chance of not reoffending if he completed treatment at the SCC. Similarly, the issue was not whether Post had a better chance of not reoffending if he was released with conditions. Yet, the State was allowed to present evidence on these questions and argue their significance to the jury. This was improper.
¶ 30 The combination of the evidence presented, the absence of limiting instructions, and the State's argument to the jury encouraged the jury to premise its decision in the case on an issue that was not before it, i.e., what was the course of action that would most likely keep Post from reoffending? Especially in a trial with a subject matter as potentially disturbing to jurors as that presented by a sexually violent predator act *814 proceeding, it is incumbent upon the trial court to carefully circumscribe the issues put to the jury in order for justice to be done. Unfortunately, that did not happen here.[12]
¶ 31 We must next decide whether the error was harmless. "Evidentiary error is grounds for reversal only if it results in prejudice." State v. Neal, 144 Wash.2d 600, 611, 30 P.3d 1255 (2001). "An error is prejudicial if, `within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" Neal, 144 Wash.2d at 611, 30 P.3d 1255 (quoting State v. Smith, 106 Wash.2d 772, 780, 725 P.2d 951 (1986)). "Improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the evidence as a whole." Neal, 144 Wash.2d at 611, 30 P.3d 1255.
¶ 32 Post argues that "[i]f presented with the idea that conditions will follow commitment, but not release, even a juror with reason to doubt the [S]tate's case would be hard pressed to ignore real or imagined concerns about public security." Br. of Appellant at 62. This contention is well taken.
¶ 33 This was a hotly contested retrial of a matter on which a prior jury had been unable to reach a verdict. During this 15-day trial, the State called 12 witnesses to testify and Post called 23 witnesses to testify. Several expert witnesses were called by each side. Post's witnesses challenged both the reliability of the diagnosis urged upon the jury by the State's witnesses and whether the actuarial instruments relied upon by the State's experts properly accounted for his age. Post presented evidence of his proposed voluntary treatment plan, supported by the testimony of an expert witness who opined as to his belief that Post would comply with the plan. There was much for the jury to consider.
¶ 34 We cannot say that the wrongly admitted evidence was of only minor significance in reference to the evidence as a whole. Indeed, the evidence was significant enough to the jury that several of its members posed questions to Anderson about the SCC treatment program and its relative rates of success. It is well within the reasonable range of probabilities that the outcome of the trial was influenced by the admission of the challenged evidence, the absence of a limiting instruction, and the State's argument. Thus, this is not a case of harmless error. Accordingly, we must reverse the judgment committing Post as an SVP and remand the cause to the trial court for further proceedings.

III
¶ 35 Several additional issues raised by Post need to be addressed in order to facilitate proceedings on remand.
¶ 36 First, Post claims that two of the State's witnesses were wrongly allowed to testify as to his credibility. The testimony in question was that of Stuart Frothingham, a risk management specialist with DOC, who conducted a sexual offender treatment program interview of Post, and Anderson, Post's former forensic therapist at the SCC.
¶ 37 Generally, no witness may offer testimony in the form of an opinion regarding the guilt or veracity of a criminal defendant. State v. Kirkman, 159 Wash.2d 918, 927, 155 P.3d 125 (2007). Such testimony is unfairly prejudicial to the defendant because it invades the exclusive province of the jury. Kirkman, 159 Wash.2d at 927, 155 *815 P.3d 125. However, testimony that is not a direct comment on the veracity of a witness is not improper if such testimony is otherwise helpful to the jury and is based on inferences from the evidence. City of Seattle v. Heatley, 70 Wash.App. 573, 578, 854 P.2d 658 (1993). This rule applies in SVP proceedings as well as criminal cases. In re Det. of Bedker, 134 Wash.App. 775, 778, 146 P.3d 442 (2006).
It has long been recognized that a qualified expert is competent to express an opinion on a proper subject, even though he thereby expresses an opinion on the ultimate fact to be found by the trier of fact. The mere fact that the opinion of an expert covers an issue which the jury has to pass upon does not call for automatic exclusion.
Kirkman, 159 Wash.2d at 929, 155 P.3d 125 (citations omitted).
¶ 38 A central issue in the case was whether Post would more likely than not reoffend if not confined in a secure facility. To prove that he was not likely to reoffend, Post presented evidence of his voluntary community treatment program. This plan was, in part, premised on his pledge to establish and maintain contact with a support team and obtain sex offender treatment. Post's expert, Dr. Rosell, testified that he believed that Post would comply with his proposed treatment plan. A stated basis of Dr. Rosell's opinion was Post's then-current treatment compliance and program participation.
¶ 39 Several of the State's expert witnesses spoke of the importance of honesty in sex offender treatment. Anderson, who, at one time, was Post's primary therapist, testified that it is critical for sex offenders to be honest in treatment and that a relapse prevention plan, without honesty, would fail. Anderson further testified, without objection, that Post was "not fully engaged in treatment" and that it was "impossible for [Post] to progress in treatment" because: (1) historically, Post spent a great deal of time attempting to portray a positive image, rather than revealing details about himself that would be useful in treatment; (2) Post was "evasive" and "disingenuous" in treatment; and (3) Post repeatedly attempted to "manipulate his way through the treatment program." VRP (Dec. 7, 2004) at 57. Moreover, on direct examination, Post himself admitted to lying in the past, conceding that: "I've lied and manipulated in an attempt to make myself perhaps appear better than I really was so that I could get out of prison and go home." VRP (Dec. 13, 2004) at 37.
¶ 40 Post points to multiple excerpts from Anderson's testimony that he claims constitute an improper opinion about Post's credibility. However, in only one instance did Post interpose an objection on the basis that the testimony improperly commented on Post's credibility.[13] Post challenges the emphasized statement in the following exchange between the prosecutor and Anderson:
Q. I was asking you if you could give us an example or two of Mr. Post's behavior that you consider manipulative.
. . . .
A. Yes. He also informed me, on a number of different occasions, that really what he was doing was committing property crimes, and that rape was really not in the forefront of his mind at all; but yet in the reports of the crimes that he's committed that I've read, they all indicate that the crimes are committed first and the burglary, the robbery was committed second, which sort of belies the report that his primary intent was property crime. He went in and raped first. I consider that to be a manipulation of the facts related to *816 the matter in order to make him look better.
Q. And given his history and the number of rapes that he has actually committed, is it even possible that those offenses were not sexually related?
A. It is implausible.

Q. You mentioned earlier that for psychopaths
[DEFENSE COUNSEL]: I (inaudible) objection and move to strike as to Mr. Anderson's commentary on credibility and his conclusions.
THE COURT: Objection overruled.
VRP (Dec. 7.2004) at 64-65 (emphasis added).
¶ 41 Anderson was not commenting on Post's credibility as a witness. He was testifying as to Post's dishonesty in treatment. This testimony was relevant to Post's likelihood of success in treatment, a key contention in Post's defense case. Thus, the trial court properly admitted Anderson's testimony as evidence relevant to an issue squarely before the jury.
¶ 42 Post also challenges the propriety of the admission of the emphasized statements in the following exchange between the prosecutor and Frothingham:
Q: [Defense Counsel] was asking you about offenders who have overwhelming and numerous sexual deviant fantasies. Is it your experience that some individuals are less than candid during these interviews? Is that correct?
A: Some, yes.
Q: And, in fact, in this case, it was your opinion that Mr. Post was being less than candid with you?
[DEFENSE COUNSEL]: Objection, Your Honor. Relevance.
THE COURT: Objection overruled.
A: Yes, it was my opinion that Mr. Post was being a bit hesitant, and I'm trying to recall the exact phrasing I had, but, yes, there was some hesitation in his presentation.

Q: And, in fact, you wrote in your treatment report that you had trouble making a recommendation because of his lack of candor, is that right?
[DEFENSE COUNSEL]: Objection. Leading.
THE COURT: Objection overruled.
A: It does make it more difficult to make treatment recommendations without full candor, yes.

VRP (Nov. 18, 2004) at 129-30 (emphasis added).
¶ 43 Frothingham did not comment on Post's veracity as a witness. He merely described Post's demeanor in treatment and explained how it was difficult for him to make a treatment recommendation in the absence of total candor. As explained, evidence of Post's lack of candor in past treatment settings was properly admitted for the jury's consideration. There was no error.

IV
¶ 44 Post next contends that the trial court abused its discretion by granting the State's motion to exclude evidence that, if Post was released from total confinement, the State could file another SVP petition if Post committed a "recent overt act."
¶ 45 A recent overt act becomes an issue when the State files a petition to commit someone as an SVP and that person was living in the community on the date that the petition was filed. RCW 71.09.060(1). Under such circumstances, the State is required to prove beyond a reasonable doubt that the respondent committed a recent overt act.[14] RCW 71.09.060(1).
¶ 46 Post argues that evidence that he could face another commitment proceeding if he committed a recent overt act while out of custody was relevant to show his motivation not to reoffend. Thus, he contends, it tended to prove that he was less likely to reoffend. However, recent overt acts were not at issue *817 in Post's commitment trial because he was not living in the community when the State filed its petition seeking his commitment. The legislature has expressly provided that a jury should be presented only with "conditions that would exist or that the court would have the authority to order in the absence of a finding that the person is a sexually violent predator." RCW 71.09.015.
In determining whether or not the person would be likely to engage in predatory acts of sexual violence if not confined in a secure facility, the fact finder may consider only placement conditions and voluntary treatment options that would exist for the person if unconditionally released from detention on the sexually violent predator petition.
RCW 71.09.060(1).
¶ 47 We recently rejected an argument identical to that which Post now makes. In State v. Harris, 141 Wash.App. 673, 174 P.3d 1171 (2007), the respondent in an SVP commitment proceeding contended that the trial court erred by "excluding evidence at trial that the State could file a petition for his commitment if he were released. Harris argued that the evidence was relevant to show he was at a lower risk of reoffense because of the State's ability to file an SVP petition." Harris, 141 Wash.App. at 679, 174 P.3d 1171. We denied Harris's claim for relief, noting that "under RCW 71.09.015 and RCW 71.09.060(1), Harris could only present evidence concerning conditions that would actually exist if he was released from custody." Harris, 141 Wash.App. at 680, 174 P.3d 1171. Our decision in Harris controls our decision in this case.
¶ 48 The trial court did not abuse its discretion in granting the State's motion to exclude evidence related to possible State action should Post be released and later commit a "recent overt act." Such a hypothetical scenario was beyond the scope of the issues properly before the jury. Harris, 141 Wash.App. at 680, 174 P.3d 1171. There was no error.

V
¶ 49 Post next alleges that the diagnosis paraphilia NOS rape is not based on sound scientific principles and, thus, he contends that admission of evidence of such a diagnosis violated his right to substantive due process as addressed in Kansas v. Crane, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002).
¶ 50 The United States Supreme Court has upheld SVP involuntary commitment statutes as satisfying substantive due process concerns so long as
(1) "the confinement takes place pursuant to proper procedures and evidentiary standards," (2) there is a finding of "dangerousness either to one's self or to others," and (3) proof of dangerousness is "coupled . . . with the proof of some additional factor, such as a `mental illness' or `mental abnormality.'"
Crane, 534 U.S. at 409-10, 122 S.Ct. 867 (quoting Kansas v. Hendricks, 521 U.S. 346, 357-58, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)). Substantive due process is satisfied if a finding of dangerousness is linked to the existence of a mental abnormality or personality disorder that makes it seriously difficult for the person with the abnormality or disorder to control his or her behavior. Crane, 534 U.S. at 410, 413, 122 S.Ct. 867. Consistent with Crane and Hendricks,
a diagnosis of a mental abnormality or personality disorder is not, in itself, sufficient evidence for a jury to find a serious lack of control. Such a diagnosis, however, when coupled with evidence of prior sexually violent behavior and testimony from mental health experts, which links these to a serious lack of control, is sufficient for a jury to find that the person presents a serious risk of future sexual violence and therefore meets the requirements of an SVP.
Thorell, 149 Wash.2d at 761-62, 72 P.3d 708. This satisfies substantive due process concerns.
¶ 51 Post rests his substantive due process argument on his contention that the evidence he now challenges "fails to satisfy fundamental principles of sound science." Br. of Appellant at 54. By doing so, Post improperly attempts to transform that which *818 should have been raised as an evidentiary challenge in the trial court into a question of constitutional significance on appeal. In point of fact, Post attempts to sidestep the fact that he did not seek a Frye[15] hearing in the trial court, and, thus, has not preserved an evidentiary challenge for review.[16]In re Det. of Taylor, 132 Wash.App. 827, 836, 134 P.3d 254 (2006), rev. denied, 159 Wash.2d 1006, 153 P.3d 196 (2007).
¶ 52 Here, the jury's findings and the trial court's judgment based on those findings were consistent with the demands of Crane, Hendricks, and Thorell. In the SVP context, substantive due process concerns are addressed to whether the State action (involuntary commitment) is supported by adequate factual findings (mental abnormality or personality disorder plus dangerousness). Here, these substantive due process concerns were satisfied. Similarly, the quantity and quality of evidence was sufficient to support the jury's verdict.[17]
¶ 53 Post does not dispute that he has previously been convicted of a crime of sexual violence. Although he personally denies that he suffers from a mental abnormality or personality disorder, both Dr. Rawlings, the State's expert, and Dr. Wing, Post's proposed community treatment therapist, testified that Post suffers from paraphilia NOS rape. The State correctly notes that numerous courts have previously upheld commitments based on diagnoses of paraphilia NOS rape or nonconsent.[18]
¶ 54 State witness Dr. Rawlings testified that while there is some controversy over the diagnosis of paraphilia NOS rape, it is generally accepted in the scientific community of *819 people who treat serious sex offenders and those who evaluate sex offenders under the SVP law.[19]
¶ 55 The State's expert opined that Post has severe difficulty controlling his sexually violent behavior and is more likely than not to reoffend unless he is in a confined setting. Dr. Rawlings based his opinion on his interview with Post as well as his review of 13,000 pages of records including Post's criminal history, sexual history, client history, relationship history, psychological history, substance abuse history, and sex offender treatment history. The jury was free to believe the testimony of the State's expert witness. There was no error.

VI
¶ 56 Finally, Post contends that the State committed prosecutorial misconduct by introducing evidence of his invocation of his right against self-incrimination in a 1988 criminal proceeding. The State introduced evidence of the fact that Post did not testify at his criminal trial, and that he "refused to discuss the charges" with a community corrections officer who interviewed Post for a presentence report after Post was convicted. VRP (Dec. 13,2004) at 147-51.
¶ 57 A criminal defendant's right to remain silent continues through sentencing. Mitchell v. United States, 526 U.S. 314, 325, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999); Estelle v. Smith, 451 U.S. 454, 462-63, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Thus, it was improper for the State to cite to Post's presentencing silence as proof that he lacked remorse for his crime. We are confident that the issue will not arise again on remand.

VII
¶ 58 Although Post raises several additional claims of error, we need not address these claims, given our resolution of the issues previously discussed.

VIII
¶ 59 We reverse the judgment committing Post as a sexually violent predator and remand the cause to the trial court for further proceedings.
WE CONCUR: APPELWICK, J.
BECKER, J., dissenting.
¶ 60 Despite his record of sexually violent acts and his failure to complete sex offender treatment while confined, Charles Post asked a jury to find that he was unlikely to reoffend if released because he had a voluntary plan. The trial court properly allowed the jury to hear testimony describing the treatment phases that Post failed to complete while he was at the Special Commitment Center (SCC). The majority holds that such evidence was irrelevant and unfairly prejudicial to Post. I respectfully dissent and would affirm the order of commitment.
¶ 61 A key question for the jury was whether Post was "likely to engage in predatory acts of sexual violence if not confined to a secure facility."[1] They were given a standard instruction explaining that this element "means that the person more probably than not will engage in such acts if released unconditionally from detention in this proceeding."[2] The need to assess Post's likelihood of reoffending if not confined was a central task for the jury. In this type of proceeding, both sides are properly allowed to present expert witnesses who make risk predictions based on various tests and factors.
¶ 62 Post's position was that he was unlikely to reoffend if released, not only because he had a voluntary treatment plan but also because he had already learned what he needed to know to stop himself from reoffending. Post admitted that he had been unable to advance beyond the two introductory stages of the SCC program, but he testified that he had been able to learn enough in an earlier *820 four-month program so that he did not need additional sex offender treatment.[3] His wife  the center of his community support team  testified that in her opinion, Post was a "treated sex offender" who had "gone through a lot of treatment thus far."[4] She thought he needed sex offender treatment in the community only to reinforce what he had already learned.
¶ 63 The State was entitled to rebut this testimony by showing that Post was far from being a fully treated sex offender. The relevance of Dr. Anderson's description of the full six stages of the program at the Special Commitment Center was to show what it takes for a sex offender to be fully treated. The State's closing argument properly pointed out, without objection, that Post's failure to go beyond the introductory classes at the SCC showed how much he had yet to learn in order to lower his risk:
[H]e is not going to progress in treatment until he begins to be truthful. He has no concept of an offense cycle. He has never been able to articulate what it was he was thinking while he was waiting for [one of the rape victims] . . . and because he doesn't know what his offense cycle is, he has no relapse prevention plan. A relapse prevention plan are those external and internal modifications that when he starts to go into cycle, he can do something about it, but he doesn't know how to do that, nor do any of the members of his support team. . . . He also has no sexual arousal modification system. This is the class that isn't taught until the fifth phase of the SCC treatment and the sixth phase. He's nowhere near there. He's still struggling with victim empathy.[[5]]
The State also summarized the results of a study showing that individuals who were treated in a secure facility recidivated at a lower rate than individuals who did not complete treatment in a secure facility. "So community-based treatment is not going to help Charles Post. He needs treatment in a secure facility to give him a chance to get out without reoffending."[6] Such an argument is proper and the evidence supporting it is squarely relevant to the question whether or not a particular individual will likely reoffend if unconditionally released into the community.
¶ 64 Post inaccurately phrases the question that was before the jury as "whether the state proved a mental abnormality that made Post likely to reoffend."[7] That was the question before the jury in People v. Rains, the California case relied on by the majority: whether a diagnosed mental disorder makes the person "a danger to the health and safety of Others in that it is likely that he or she will engage in sexually violent criminal behavior." People v. Rains, 75 Cal.App.4th 1165, 1168, 89 Cal.Rptr.2d 737 (1999). The California court held that the jury, to decide that question, does not need to know what the consequences will be if the answer is yes. Therefore, the Rains trial court erred by admitting testimony that the consequences would be an order committing the individual to a hospital for two years for treatment. Similarly, Post argues that it was error to allow the jury to hear about the treatment program at the SCC. In Post's view, such evidence was likely to distract the jury from their true task deciding whether Post was likely to reoffend.
¶ 65 Post's argument ignores a significant difference between our statute and the California statute. The question for the jury in this case was whether Post's mental condition made him likely to engage in predatory acts of sexual violence "if not confined to a secure facility." In the proceedings under our statute, the jury is entitled to know about consequences. The jury necessarily knows that indefinite commitment will be the consequence if they decide the detainee is a sexually violent predator. The jury necessarily *821 considers public safety and necessarily focuses on the relative risks of secure confinement as compared to unconditional release. Therefore, Rains is not on point and the majority errs in relying on it.
¶ 66 What the jury may not consider under our statute is whether there is a third option for the detainee: to place him in a setting less restrictive than total confinement, but more restrictive than unconditional release. A statute provides that the jury may consider "only placement conditions and voluntary treatment options that would exist for the person if unconditionally released from detention" on the sexually violent predator petition.[8]See RCW 71.09.060(1); In re Detention of Thorell, 149 Wash.2d 724, 751-53, 72 P.3d 708 (2003). A number of years ago, this statute was held to violate equal protection when compared to chapter RCW 71.05 because it does not allow consideration of less restrictive alternatives until after commitment. In re Detention of Brooks, 145 Wash.2d 275, 36 P.3d 1034 (2001). Thorell overruled Brooks on this point.
¶ 67 The majority agrees with Post that the purpose of the statute is to provide respondents such as Post with the right to present evidence of voluntary treatment options. Post argues that evidence of the treatment program at the SCC must be excluded because the statute does not expressly give the State "a corresponding right" to present such evidence.[9] This is a misreading of the statute and the majority errs by adopting it. The purpose of the statute, and the instruction based upon it, is to prevent the jury from hearing about alternatives less restrictive than confinement in a secure facility. This is because such alternatives do not exist at the time of the initial commitment hearing under chapter RCW 71.09; they may only be considered after an individual has been committed as a sexually violent predator. See Brooks, 145 Wash.2d at 293, 36 P.3d 1034. The statute, in other words, leaves no middle ground for the jury to consider. The statutory instruction ensures that the jury knows their decision will either release the detainee into the community with no conditions or will keep him confined in a secure institution.
¶ 68 The trial court's rulings kept the jury properly focused on these two options. The majority is concerned that the jury might have improperly committed Post just to make sure he got treatment, or to make it possible for him to be released with conditions. The record does not bear out this concern. The State elicited only brief testimony from Anderson that some individuals committed to the Special Commitment Center have been "released on conditions," including treatment in the community under the umbrella of court supervision.[10] Post did not object to this testimony. Later the State conducted a thorough cross-examination of defense witness Dr. Rosell. Without objection, Dr. Rosell testified that it was desirable to keep an offender like Post under supervision and that before he was released he needed to understand his offense cycle and have a relapse plan in place that was based on his offense cycle.[11] The State then attempted to elicit from Dr. Rosell that the community would be better protected if Post completed the SCC treatment program. The State also asked Dr. Rosell if he understood that Post could be released with court supervision if he completed the treatment program at the SCC.[12] The court sustained Post's objections to both questions and instructed the jury to disregard them. We must presume the jury did so, and must accordingly conclude that the questions did not distract the jury from its essential task.
¶ 69 The statute directs that a jury may consider only placement and treatment options that will be available to a person who is released unconditionally. The statute does not, as Post suggests, prevent the State from comparing the defendant's proposed unconditional release plan to the sex offender treatment program inside the institution. As the trial court rightly stated, the State must be *822 allowed to show that voluntary treatment is not the model that works; the model that works is in-custody. Post had started to go through the in-custody treatment model but failed to complete it. There is every reason why the jury should be allowed to consider all of the steps of treatment that Post had not yet completed because such evidence bears on the question whether he is likely to reoffend if released unconditionally.
¶ 70 Post assigns error to the trial court's failure to give a limiting instruction. A trial court's refusal to give a requested instruction is reviewed for abuse of discretion. Stiley v. Block, 130 Wash.2d 486, 498, 925 P.2d 194 (1996). Instructions are sufficient if they correctly state the law, are not misleading, and permit the parties to argue their theories of the case. State v. Peerson, 62 Wash.App. 755, 771, 816 P.2d 43 (1991). Considerable discretion is allowed when tailoring instructions to fit case facts. RWR Management, Inc. v. Citizens Realty Co., 133 Wash.App. 265, 278, 135 P.3d 955 (2006). Post proposed that the court should tell the jury they "may not vote to commit Mr. Post merely because you would prefer that he have conditions upon his release or that you prefer the Special Commitment Program to his voluntary program." His proposed instruction would have injected issues into the case that the evidence did not raise and that the State's argument did not invite the jury to consider.[13] The instructions given were sufficient to limit the jury to deciding whether Post was a sexually violent predator.
¶ 71 In a case where the detainee claims to have a voluntary treatment plan that will make him safe to be at large in the community, it is entirely appropriate for the State to argue that completing treatment in a secure facility is a better way to reduce the risk. The restraint the majority imposes on the State's ability to present, evidence of institutional treatment is not called for by the statute and is an unjustified obstacle to proof.
¶ 72 Finding no error, I would affirm.
NOTES
[1] ER 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Irrelevant evidence is not admissible. ER 402.
[2] ER 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
[3] The trial court expressed concern about the potential prejudicial effect of such evidence:

I don't see how this case can be tried without the jury having some understanding of the treatment plan at the SCC. I am concerned however that the jury get sidetracked with the idea that this is an order that is not, for lack of a better word, serious because it can always be revisited and he can be released to the community, and that's what I'm really concerned about is this concept that the jury is going to  if we talk about subsequent release to the community in very much detail at all, that the jury is going to have a tendency to take less seriously this decision about whether he's  whether Mr. Post should be committed initially and that . . . would be completely improper and unfair to Mr. Post.
Verbatim Report of Proceedings (VRP) (Nov. 4, 2004) at 23. The trial court, nevertheless, explained how the evidence could be presented in the following exchange with the State:
The Court: Well, the testimony from the State needs to be couched in the difference between the kind  the only relevance of SCC testimony is the  to explain to the jury the difference between the voluntary plan and the commitment plan. I don't want, we don't  and I don't see  when we get there  I mean, it isn't, it certainly isn't balancing plans or anything of that sort, but I don't know how a jury could evaluate the defense testimony which  and there is no point in reserving this until rebuttal, but everybody knows what the testimony is going to be, more or less here.
I'm going to think about what we're going to do with LRA, that aspect of this, whether the jury would be informed at some point there would be treatment in the community or not. So I'm going to think about that and I'll issue 
[The State]: Your Honor, if I could just suggest that the State would propose that the language regarding that would be just conditional release.
The Court: All right.
VRP (Nov. 4, 2004) at 24-25.
[4] The court explained its belief as to why evidence of the SCC program was admissible:

The only . . . reason anything of the SCC treatment program is being admitted, is to the extent it sheds light on why the program presented by the . . . respondent, will not preclude his finding of being an SVP. . . . The only reason we're getting into anything about the SCC treatment is that  I can't conceive of how the State can rebut the testimony of the Defense expert concerning the efficacy of the Defense's voluntary treatment plan without saying, you know, this isn't the model that works. And this is the model that works is in  custody, and that's  I'm not expecting to hear anything about the quality, particularly of treatment, but  if I could conceive of a way that the Defense could put on the case that they are entitled to and wish to put on concerning why-because there's a voluntary treatment program, Mr. Post doesn't qualify, doesn't meet the criteria of an SVP, without touching what goes on at [the] SCC other than of course the individual treatment, I would [have] ordered it, but I couldn't think of a way that could happen. So having said that, I am not expecting to hear a lot about what a swell program it is. I'm expecting to hear the distinctions between what the Defense is offering, the respondent is offering and what an SVP is, and that is all I am expecting to hear.
VRP (Nov. 4, 2004) 112-13.
[5] This being a civil action, the jurors were permitted to submit questions directed to the witness. CR 43(k).
[6] Jurors also posed questions for Anderson about the length of time residents spend in each phase, how residents can advance in phases, how long the six-phase program had been in use, and what the recidivism rate was of released residents.
[7] Post proposed these limiting instructions:

Instruction No. 2: Jim Anderson testified about [six] phases of treatment available at the Special Commitment Program, including conditional release. This testimony may only be considered only to rebut Mr. Post's plan for voluntary treatment in the community. You may not consider such testimony for any other purposes. You may not vote to commit Mr. Post merely because you would prefer that he have conditions upon his release or that you prefer the Special Commitment Program to his voluntary program. Your role is limited to determining whether the State has proven that Mr. Post is a sexually violent predator.
Instruction No. 2A: Evidence was offered about [six] phases of treatment available at the Special Commitment Program, including conditional release. This testimony may only be considered to evaluate Mr. Post's plan for voluntary treatment in the community. You may not vote to commit Mr. Post merely because you would prefer that he have conditions upon his release or that you prefer the Special Commitment Program to his voluntary program. Your role is limited to determining whether the State has proven that Mr. Post is a sexually violent predator.
Clerk's Papers (CP) at 789-90.
[8] We review a trial court's evidentiary rulings for abuse of discretion. State v. Stenson, 132 Wash.2d 668, 701, 940 P.2d 1239 (1997). "When a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons, an abuse of discretion exists." Stenson, 132 Wash.2d at 701, 940 P.2d 1239 (citing State v. Powell, 126 Wash.2d 244, 258, 893 P.2d 615 (1995)).
[9] The legislature has specifically authorized a person in Post's position to introduce such evidence:

In determining whether or not the person would be likely to engage in predatory acts of sexual violence if not confined in a secure facility, the fact finder may consider only placement conditions and voluntary treatment options that would exist for the person if unconditionally released from detention on the sexually violent predator petition.
RCW 71.09.060(1).
[10] Under California law,

"Sexually violent predator" means a person who has been convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.
Rains, 75 Cal.App.4th at 1169, 89 Cal.Rptr.2d 737 (citing WELF. & INST. Code, § 6600(a)(1)).
[11] The State argues that a limiting instruction requested by Post was, in fact, given to the jury. However, the instruction that was given (Instruction No. 3) to which the State refers was not proposed by Post. Instruction No. 3 was a version of the general expert witness instruction and did not specifically address the SCC or LRA evidence. Instruction No. 3 provides:

A witness who has special training, education, or experience in a particular science, profession, or calling may be allowed to express an opinion in addition to giving testimony as to facts. You are not bound, however, by such an opinion. In determining the credibility and weight to be given such opinion evidence, you may consider, among other things, the education, training, experience, knowledge, and ability of that witness, the reasons given for that opinion, the sources of the witness's information, together with the factors already given you for evaluating the testimony of any other witness.
Through out this trial as the various forensic and treating psychologists testified, I informed you that some information was admitted as part of the basis for his or her opinion, but may not be considered for other purposes. You must not consider this testimony as proof that the information relied upon by the witness is true. You may use this testimony only for the purpose of deciding what credibility or weight to give the witness's opinion.
CP at 803. This instruction is essentially Washington Pattern Jury Instruction (WPIC) 365.04. Instruction No. 3 in no way addresses the concern we now discuss.
[12] On appeal, the State contends that the challenged evidence was properly admitted pursuant to ER 703, as being the bases for the opinions of expert witnesses. For two reasons, this argument is unpersuasive.

First, the sole limiting instruction given, Instruction No. 3, see footnote 11, ante, specifically addressed only whether the jury could treat the ER 703 evidence as substantive evidence. The instruction in no way limited the issues to which the jury could apply the evidence, thus not addressing our present concern.
Second, to the extent that the challenged evidence, if treated as ER 703 evidence, formed the basis for an inadmissible expert opinion  e.g., that Post's best chance not to reoffend was to complete the SCC treatment program  this evidence was itself improper.
The provisions of ER 703 are particularly problematic in SVPA proceedings. Typically, experts review thousands of pages of records and reports prior to testifying at trial. Trial courts must take great care to ensure that the provisions of ER 703 are not so loosely or broadly applied so as to undercut the primary goal of the Rules of Evidence, the enhancement of the truth-seeking function.
[13] By not objecting, Post failed to preserve for review the following challenged excerpts from Anderson's testimony: (1) that Post's description that one of his rape victims enjoyed the encounter was not plausible; (2) that Anderson "personally" did not find it "plausible" that Post would only have sexual fantasies about his wife; (3) that the reason a prior treatment provider had a different assessment of Post was because the prior treatment provider "bought his story" that Post was not a person to be concerned about; and (4) that Post "had successfully manipulated" a prior treatment provider. See RAP 2.5(a); Kirkman, 159 Wash.2d at 926, 155 P.3d 125. "Admission of witness opinion testimony on an ultimate fact, without objection, is not automatically reviewable as a `manifest' constitutional error." Kirkman, 159 Wash.2d at 936, 155 P.3d 125.
[14] "`Recent overt act' means any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act." RCW 71.09.020(10).
[15] Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (D.C.Cir.1923). "The Frye standard requires a trial court to determine whether a scientific theory or principle `has achieved general acceptance in the relevant scientific community' before admitting it into evidence." Thorell, 149 Wash.2d at 754, 72 P.3d 708 (quoting In re Personal Restraint of Young, 122 Wash.2d 1, 56, 857 P.2d 989 (1993)). "`[T]he core concern . . . is only whether the evidence being offered is based on established scientific methodology.'" Thorell, 149 Wash.2d at 754, 72 P.3d 708 (quoting Young, 122 Wash.2d at 56, 857 P.2d 989).
[16] In his briefing, Post neither cites to any decisional authority in which paraphilia NOS rape has been held not to satisfy the Frye standard, nor does he dispute the State's claim that Post failed to object to the admission of evidence that he suffered from paraphilia NOS rape. Instead Post relies entirely on statements from the following article: Robert A. Prentky et al., Sexually Violent Predators in the Courtroom: Science on Trial, 12 Psychol. Pub. Pol'y & L. 357, 364 (2006). Nothing prevents Post from requesting a Frye hearing on remand.

Insofar as Post challenges the admissibility of the diagnosis under ER 702 and 703, he also has not preserved that evidentiary issue for review because he failed to object to Dr. Rawlings' testimony that Post suffered from paraphilia NOS rape. Audett, 158 Wash.2d at 725-26, 147 P.3d 982; State v. Thomas, 150 Wash.2d 821, 856, 83 P.3d 970 (2004).
[17] In a sufficiency challenge, the evidence is viewed in the light most favorable to the State, and all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against Post. Audett, 158 Wash.2d at 727, 147 P.3d 982. The commitment will be upheld if any rational trier of fact could have found the essential elements proved beyond a reasonable doubt. Audett, 158 Wash.2d at 727-28, 147 P.3d 982.
[18] See, e.g., In re Det. of Stout, 159 Wash.2d 357, 363, 150 P.3d 86 (2007) (expert opined that Stout suffered from the mental disorder paraphilia not otherwise specified nonconsent); In re Det. of Halgren, 156 Wash.2d 795, 800, 132 P.3d 714 (2006) (expert testified that Halgren suffered from paraphilia not otherwise specified nonconsent); In re Det. of Marshall, 156 Wash.2d 150, 155, 125 P.3d 111 (2005) (expert determined Marshall suffered from paraphilia not otherwise specified (nonconsenting adults or rape-like behavior)); In re Det. of Campbell, 139 Wash.2d 341, 357, 986 P.2d 771 (1999) (expert diagnosed Campbell as suffering from the condition of paraphilia); In re Det. of Paschke, 136 Wash.App. 517, 520, 150 P.3d 586 (2007) (expert testified that Paschke suffered from a mental abnormality known as rape, paraphilia not otherwise specified, rape); In re Det. of Taylor, 132 Wash.App. 827, 832, 134 P.3d 254 (2006) (expert diagnosed Taylor as suffering from paraphilia not otherwise specified (nonconsenting persons)); In re Det. of Broten, 130 Wash.App. 326, 332, 122 P.3d 942 (2005) (expert diagnosed Broten with paraphilia, not otherwise specified); State v. Hoisington, 123 Wash.App. 138, 143, 94 P.3d 318 (2004) (expert testified that Hoisington suffered from a paraphilia that predisposed him to commit criminal sexual acts against other people); In re Det. of Strauss, 106 Wash.App. 1, 6, 20 P.3d 1022 (2001) (expert testified that Strauss suffered from paraphilia, not otherwise specified, rape); In re Det. of Mathers, 100 Wash.App. 336, 337, 998 P.2d 336 (2000) (expert diagnosed Mathers with paraphilia not otherwise specified, rape).
[19] The validity and reliability of this diagnosis was challenged by Dr. Donaldson, but, other than in the Frye standard context, such disagreement between expert witnesses goes to the weight of the evidence, not its admissibility. Thorell, 149 Wash.2d at 756, 72 P.3d 708.
[1] Clerk's Papers at 514 (Jury Instruction 5) (emphasis added); RCW 71.09.020(16).
[2] Clerk's Papers at 516 (Jury Instruction 7).
[3] Report of Proceedings (December 14, 2004) at 27-28.
[4] Report of Proceedings (December 14, 2004) at 75-76.
[5] Report of Proceedings (December 14, 2004) at 132.
[6] Report of Proceedings (December 14, 2004) at 133.
[7] Appellant's Br. at 61.
[8] Clerk's Papers at 516 (Jury Instruction 7).
[9] Appellant's Br. At 60.
[10] See Majority at 810.
[11] Report of Proceedings (December 9, 2004) at 125-26.
[12] Report of Proceedings (December 9, 2004) at 126-27.
[13] Clerk's Papers at 790 (Post's proposed limiting instruction 2A).